400 F.2d 487
 Carra A. RAULIE, William W. Raulie and Irene F. Raulie,
husband and wife, Appellants,
v.
UNITED STATES of America and John Foster Clingingsmith and
Kathryn Evelyn Clingingsmith, husband and wife, Appellees.
 No. 9145.
 United States Court of Appeals Tenth Circuit.
 Aug. 2, 1968.
 
 1
 Charles C. Spann, Albuquerque, N.M. (Grantham, Spann, Sanchez & Rager, Albuquerque, N.M., and Lynell F. Skarda, Clovis, N.M., were with him on the brief) for appellants.
 
 
 2
 Esther L. Smith, Clovis (Botts, Botts & Mauney, Albuquerque, N.M., and Blanchette, Smith & Shelton, Dallas, Tex., were with her on the brief), for appellees.
 
 
 3
 Before MURRAH, Chief Judge, BREITENSTEIN, Circuit Judge, and DELEHANT, Senior District Judge.*
 
 
 4
 DELEHANT, Senior District Judge.
 
 
 5
 The rather unusual course which this litigation has heretofore taken appears to justify, even possible to suggest, a recollection, more than ordinarily exhaustive, of the sequence in which the pleadings were filed in the trial court, and of their respective averments. An instance is here presented in which the original plaintiff, unsuccessful in the trial court, is not a real and active participant in the submission of the case to this court on appeal.
 
 
 6
 This action was instituted on July 1, 1963, in the United States District Court for the District of New Mexico, by United States of America, as plaintiff, against Carra A. Raulie, a single man, William W. Raulie and Irene F. Raulie, husband and wife; and John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, husband and wife; and also against one Ben H. Fletcher and the John Hancock Mutual Life Insurance Company, all as defendants. Jurisdiction, therefore, was claimed for, and existed in, this court, under 28 U.S.C. 1345, because of the status as plaintiff of the United States of America. Responsive to separate, and somewhat early, motions of United States of America, and by individual orders of the trial court, the case was dismissed on September 17, 1964 as to the defendant, the John Hancock Mutual Life Insurance Company, and on September 21, 1965 as to the defendant, Ben H. Fletcher. Neither of them is a participant in the present submission, or in this appellate case.
 
 
 7
 As plaintiff, the United States of America tendered its original complaint in two counts which (regard being had to the instant status of United States of America in the litigation, infra) are now only briefly recalled. In its first count, the United States of America, after a statement of the nature and general objective of the action and the identification of the then several parties defendant, alleged the incurring by the defendant Carra A. Raulie, during the years 1933 through 1940, of indebtedness to the United States; the reduction of such indebtedness to judgment on January 31, 1962, in Civil Action No. 4923, in the United States District Court for the District of New Mexico, in which United States of America was the sole plaintiff and Carra A. Raulie was the only defendant, wherein, on the date last identified, United States of America was awarded a judgment for $3,148.88, with costs of $82.20, against the defendant Carra A. Raulie; the residence together of Carra A. Raulie, William W. Raulie and Irene F. Raulie on a farm allegedly then owned of record by the defendant Carra A. Raulie and described as:
 
 
 8
 Lots 5 and 6 and the Southwest quarter of section 3, Township 2 North, Range 37, East, and the East half of the Southeast quarter of section 4, Township 2 North, Range 37 East, in Curry County, New Mexico;
 
 
 9
 the relationship as brothers between Carra A. Raulie and William W. Raulie, and timely knowledge by William W. Raulie that repeated demands for the payment of such indebtedness had been made by the United States of America upon Carra A. Raulie; the mailing on October 4, 1961 by the United States Attorney for the District of New Mexico to Carra A. Raulie of a demand letter for the payment of his indebtedness to the United States; and the execution, and filing for record, both on October 11, 1961, and recording in Deed Record Book 108 at page 224, in the office of the County Clerk of Curry County, New Mexico, of a Warranty Deed by Carra A. Raulie to William W. Raulie, conveying to William W. Raulie the real estate already herein described; and further alleged that the deed last described did not represent a bona fide transaction; that no consideration was given for it; that after such execution, Carra A. Raulie continued to occupy, and to exercise dominion and control over, the real estate described in such deed; that William W. Raulie accepted such deed for the purpose of applying for a real estate loan from Farmers Home Administration in order to help Carra A. Raulie refinance his (Carra A. Raulie's) indebtedness, and for the purpose of evading the lavy upon such land of any execution against Carra A. Raulie; that William W. Raulie did not become the owner of such land by virtue of such deed, but, rather, held title thereto in trust for the benefit of Carra A. Raulie and his creditors; and that William W. Raulie and Irene F. Raulie, his wife, knew the terms and conditions of such alleged constructive trust. Let it be remembered that the deed between the Raulie brothers was executed, filed for record, and recorded on October 11, 1961, three months twenty days before the entry on January 31, 1962 of plaintiff's judgment against Carra A. Raulie, supra.
 
 
 10
 In that first count of its complaint, the United States of America further alleged that, after the entry of the judgment in its favor against the defendant, Carra A. Raulie, on January 31, 1962, supra, an execution upon such judgment was issued; that on March 28, 1962 the United States Marshal attempted, in pursuance of such execution, to levy on the real estate hereinbefore described; that Carra A. Raulie and William W. Raulie concealed from the United States Marshal the 'fact,' (meaning obviously the contention in that respect of the United States) that Carra A. Raulie was the true owner of the land and William W. Raulie merely held the title to it in trust, and by such concealment and deception misled the United States Marshal into refraining from levying upon, or selling, the land under such execution, but without alleging how or in what manner such 'concealment' or 'deception,' if any, was effected or practiced, unless, and except, insofar as, such 'concealment' or 'deception,' or both, be attributed to the state of the then public record, supra, of the title to said land; that, on May 10, 1962, the defendants, William W. Raulie and Irene F. Raulie, executed a warranty deed of the foregoing land to the defendant John Foster Clingingsmith which, on June 6, 1962, was filed for record and recorded in Deed Record Book 111 at page 149, in the office of the County Clerk of Curry County, New Mexico, and, 'on information and belief, that Clingingsmith knew, when he accepted such deed, that William W. Raulie was not the true owner of the land thereby conveyed, but merely held title to it in trust for the defendant, Carra A. Raulie and his creditors; and that such deed to John Foster Clingingsmith was given and accepted in lieu of a mortgage, and for the purpose of securing certain loans of money from Clingingsmith to Carra A. Raulie, and there was no bona fide sale and transfer of such land;' that on July 1, 1962, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, his wife, executed a mortgage deed of and respecting said real estate to defendant, John Hancock Mutual Life Insurance Company in the principal sum of $30,000, which on July 5, 1962 was filed for record and recorded in Mortgage Deed Book 145 at page 12 of the records of the County Clerk of Curry County, New Mexico; and, again 'on information and belief,' that the defendant John Hancock Mutual Life Insurance Company knew that Carra A. Raulie was indebted to the United States, that demand had been made upon him for payment, that judgment had been rendered against him; and that he had deeded the land (in trust) to William W. Raulie for the purpose of evading his creditors; and also knew that, when William W. Raulie and Irene F. Raulie deeded such land to Clingingsmith, William W. Raulie was not the true owner thereof, and that the deed from William W. Raulie and Irene F. Raulie to Clingingsmith was, in effect, a mortgage.
 
 
 11
 And, concluding the first count of its complaint, the United States of America prayed, alternatively, for judgment, either:
 
 
 12
 '(1) Cancelling and setting aside the deed from carra A. Raulie to William W. Raulie, dated October 11, 1961, and filed for record in Book 108, page 224 of the records of the County Clerk's Office in Curry County, New Mexico, which purported to convey Lots 5 and 6, and the SW 1/4 of Section 3 and the E1/2 SE1/4 of Section 4, Township 2 North, Range 37 East; or,
 
 
 13
 '(2) for judgment holding that the foregoing described deed merely created a constructive trust whereby William W. Raulie held title to the land for the benefit of Carra A. Raulie and his creditors; and,
 
 
 14
 '(3) for judgment impressing upon this land the lien of plaintiff for $3,148.88 principal and $82.20 costs, obtained as a judgment in Civil Action No. 4923, as of the date when the United States Marshal attempted to levy the execution in Civil Action No. 4923, which date is March 28, 1962; and,
 
 
 15
 '(4) for judgment holding that the deed from William W. Raulie and Irene F. Raulie to John Foster Clingingsmith and the title transferred thereby, is subject to and inferior to the judgment lien of plaintiff for $3,148.88 and $82.20 costs; and,
 
 
 16
 '(5) for judgment holding that the mortgage deed given by John Foster Clingingsmith and Kathryn Evelyn Clingingsmith to the John Hancock Mutual Life Insurance Company is subject to and inferior to the judgment lien of plaintiff for $3,148.88 and $82.20 costs.'
 
 
 17
 At this point, and with reference to each allegation of the first count of the complaint, or any portion of the prayer just quoted, insofar as such allegation or portion of such prayer is aimed at or against either of the original defendants, Ben H. Fletcher and the John Hancock Mutual Life Insurance Company, it is expressly recalled that, upon the several motions of the United States of America itself, this action and the complaint herein have been dismissed as against each and both of those two defendants, supra.
 
 
 18
 Turning now to the second count of the complaint, and, still retaining the recollection of the dismissals last mentioned and each of them, it is here noted that, after first 'adopting as part of' such 'count all of the applicable allegations contained in count one,' the United States of America, in such second count, alleged only (1) that William W. Raulie and Irene F. Raulie, knew that Carra A. Raulie had received numerous demands from Farmers Home Administration officials to pay the indebtedness which he owed to the United States; and that he had received a demand letter concerning the account from the United States Attorney; (2) that William W. Raulie and Irene F. Raulie entered into a scheme and device whereby they would help Carra A. Raulie conceal his assets from the United States, by William W. Raulie taking title to the land described heretofore, and by concealing its true ownership from the United States Marshal; and (3) that by reason of such concealment and fraud and the fraudulent acts of said defendants, plaintiff was prevented from levying an execution on said land, and from collecting the judgment for $3,148.88 and $82.20 costs, rendered in Civil Action No. 4923, supra.
 
 
 19
 And the United States of America concluded its second count in such complaint with a prayer for'judgment against William W. Raulie and Irene F. Raulie, and each individually, in the sum of $3,231.08;' and 'judgment for such other and further relief to which it is entitled under this complaint, and for the costs of this action.'
 
 
 20
 By way of preliminary clarification, and upon the basis of evidence clearly reflected in the record, it is mentioned at this juncture that, under date of June 26, 1916, the parcel of real estate already described herein consisting of approximately 301.23 acres was, by the United States of America, and by letters patent in due form, conveyed to one Annie Raulie, and that such instrument of conveyance was filed for record on June 1, 1917, and is duly recorded in Book 5 at page 42 of the Records of Patents of Curry County, New Mexico. The record before the trial court and this court also discloses without controversy evidence that Annie Raulie was a widow when she acquired such land, and, still a widow, died intestate during the year 1943, and left as her heirs at law, Carra A. Raulie, William W. Raulie and Ray Raulie, her sons, and Lela Gertrude Raulie, unmarried, her daughter. In that behalf, however, this court observes in the record an allusion to 'another sister' (that is to say, another daughter of Annie Raulie) 'that lived up in Colorado,' but who was dead on, and for some unspecified time before, August 21, 1957 (vide infra). Precisely when she died, and whether she left issue who might well have survived, and inherited from, Annie Raulie this court has not discerned from the record. And no question has been tendered upon that point.
 
 
 21
 Thereafter, and on August 21, 1957, Ray Raulie, a single man, William W. Raulie and Irene F. Raulie, his wife, and Lela Gertrude Raulie, a single woman, joined in the execution and delivery to Carra A. Raulie, (who then was and still is a single man) a quit claim deed of and respecting all of such real estate; and on August 22, 1957 at 8:40 o'clock A.M., such quit claim deed was duly filed for record and recorded in the Records of Deeds in the office of the County Clerk of Curry County, New Mexico. Thereby the title to all of such real estate was vested of record in the defendant, Carra A. Raulie.
 
 
 22
 Thereafter, but prior to October 11, 1961, Carra A. Raulie, as security for sundry loans, executed and delivered mortgages upon the foregoing real estate (a) to the John Hancock Mutual Life Insurance Company for a substantial sum of money; (b) to one J. J. Steele, stated in the record to have been for the principal sum of $8,000.00; and (c) to said J. J. Steele, also stated in the record to have been for the principal sum of $2,000.00. And Carra A. Raulie also owed indebtedness to other creditors in a substantial aggregate amount.
 
 
 23
 On October 11, 1961, Carra A. Raulie executed and delivered to William W. Raulie, ostensibly, 'for consideration paid' a warranty deed of and respecting the foregoing real estate expressly 'subject to an indebtedness of Thirty-four Thousand Eight Hundred sixty-three ($34,863.00) Dollars now against said above described real property,' which deed was on the date of its execution filed for record and recorded in the office of the County Clerk of Curry County, New Mexico.
 
 
 24
 Thereafter, and on May 10, 1962, the defendants William W. Raulie and Irene F. Raulie, husband and wife, ostensibly 'for consideration paid,' executed and delivered to the defendant, John Foster Clingingsmith, of Dallas, Texas, a Warranty Deed conveying to said John Foster Clingingsmith the foregoing real estate, which Warranty Deed contained the following recital:
 
 
 25
 'And the further consideration of the assumption by John Foster Clingingsmith, grantee herein of that certain First Mortgage to John Hancock Mutual Life Insurance Co., which has $18,000.00 (eighteen thousand dollars) principal balance at this time; and assumption of that second mortgage now owned and held by J. J. Steele, with the present principal balance in the amount of $14,490.24 (fourteen thousand four hundred ninety dollars and 24 cents).'
 
 
 26
 That Warranty Deed was on June 6, 1962 filed for record and recorded in the office of the County Clerk of Curry County, New Mexico, in Book 111 at Page 149 of the deed records of such office.
 
 
 27
 The institution by the United States of America in the trial court of this action on July 1, 1963, therefore, occurred slightly less than one year, one month after the recording of the deed conveying such real estate from William W. Raulie and his wife to John Foster Clingingsmith. The general character and numerous details of the contentions advanced in its complaint in this action by the United States of America have already been mentioned. Attention is now given briefly to the pleadings whose service and filing were precipitated by this suit of the federal government. For it is out of the pleadings thus precipitated, rather than directly out of the complaint of the plaintiff, United States of America, that the controversies presently considered by this court arose.
 
 
 28
 The defendants William W. Raulie and Irene F. Raulie, on July 22, 1963 served, and on July 23, 1963 filed, their SEPARATE ANSWER to the complaint of the United States. In such separate answer, as to the complaint's First Count, they admitted the jurisdiction of the United States District Court for the District of New Mexico, and the general purpose of the United States in the institution of the action, and their own place of residence as alleged in the complaint; disclaimed, on their part, knowledge of, or participation in, Carra A. Raulie's incurring of indebtedness to the United States and in the latter's prosecution of suit and recovery of judgment therefor; somewhat inexactly admitted their residence 'at times' in the described real estate, and its then ownership by Carra A. Raulie, and asserted that Carra A. Raulie's indebtedness was 'his personal affair,' and quite inaccurately, yet intelligibly, denied responsibility for the personal indebtedness of Carra A. Raulie; denied knowledge of correspondence, between the United States Attorney and Carra A. Raulie, admitted the execution by Carra A. Raulie to William W. Raulie of the deed of conveyance alleged in the compaint (making such admission inaccurately, or at least incompletely, in like manner as if it had been a conveyance to both answering defendants instead of only to William W. Raulie), and alleged that such deed of conveyance 'was pursuant to a bona fide transaction, made in good faith, for consideration and that at the time they had no notice of any claim or lien by the plaintiff, or anyone, against said property which was owned by the grantor free of any incumbrance,' denied successively the want of good faith in such conveyance, the want of consideration therein, Carra A. Raulie's post conveyance persistence in the occupancy and control of such land, and also that William W. Raulie had accepted the deed for the purpose of applying for an F.H.A. real estate loan, in order to help Carra A. Raulie in refinancing his indebtedness, or for the purpose of evading the levy of an execution against it; denied that William W. Raulie did not become the owner of the land deeded, but merely held the title to it in trust for Carra A. Raulie and his creditors, and that William W. Raulie and Irene F. Raulie knew the terms and limitations of any constructive trust whereunder William W. Raulie held title to the land; denied that on March 28, 1962, the United States Marshal attempted to levy an execution against Carra A. Raulie on plaintiff's judgment, that Carra A. Raulie and William W. Raulie concealed from such Marshal the fact (so asserted by plaintiff) that Carra A. Raulie was the true owner of the land and William W. Raulie merely held title in trust, and by such concealment and deception misled the Marshal into refraining from the levy upon, and sale of, such land under execution; and denied that at a time after July 1, 1962 William W. Raulie executed a farm lease upon such land to Ben H. Fletcher; and that Fletcher paid cash rent and had no interest or right of possession beyond the 1963 crop season; admitted that on May 10, 1962 William W. Raulie and Irene F. Raulie executed a warranty deed of the land to John Foster Clingingsmith; alleged that such deed was by them given with full right and authority, as the owners of title to such land, and there were no liens or encumbrances against the same; and denied that such instrument was intended as a mortgage; neither admitted nor denied the execution on July 1, 1962 by John Foster Clingingsmith and his wife of a mortgage for $30,000.00 on the land to John Hancock Mutual Life Insurance Company; and alleged that they, William W. Raulie and Irene F. Raulie, were not parties to any such transaction if it occurred; disclaimed knowledge of any dealings between Clingingsmith and JohnHancock Mutual Life Insurance Company, and as to all allegations that John Foster Clingingsmith held title as a mortgagee or that William W. Raulie or Irene F. Raulie as grantees of Carra A. Raulie accepted the conveyance from him to assist him in evading any judgment due from Carra A. Raulie, declared that such allegations were untrue.
 
 
 29
 And as to Count II of the complaint of the United States, the defendants William W. Raulie and Irene F. Raulie, in such separate answer, reiterated by reference their pertinent answers to the averments of Count I of such complaint, and explicitly denied each allegation of Count II of the complaint, and thereby denied (a) that they knew that Carra A. Raulie had received numerous demands from F.H.A. officials to pay his indebtedness to the United States, and that he had received a demand letter concerning the account from the United States Attorney; (b) that William W. Raulie and Irene F. Raulie entered into any scheme or device whereby they would help Carra A. Raulie to conceal his assets from the United States, by means of William W. Raulie's taking of title to such land and concealing its true ownership from the United States Marshal; and (c) that by reason of any such concealment or fraud, plaintiff was prevented from levying an execution on such land or from collecting its alleged judgment against Carra A. Raulie.
 
 
 30
 And the answering defendants William W. Raulie and Irene F. Raulie prayed for the denial in its entirety of the relief demanded by the plaintiff, United States, in its complaint.
 
 
 31
 The defendant, Carra A. Raulie, on July 27, 1963 served, and on July 29, 1963 filed, his separate answer to the complaint of the United States. In that separate answer, as to the averments in Count I of the complaint, the defendant, Carra A. Raulie admitted that the United States of America had instituted this action against the defendants already identified herein; that the United States District Court for the District of New Mexico had jurisdiction under 28 U.S.C. 1345, supra; that he then lived at Route 1, Box 3, Texico, Curry County, New Mexico, but neither admitted nor denied the complaint's allegations respecting marital status, corporate status, and place of residence of other parties to the suit; admitted the complaint's allegations of his incurring of indebtedness to the United States and of the procurement by the United States of judgment therefor against him; admitted (although patently referring erroneously to paragraph 4 rather than paragraph 5 of the complaint) that during the calendar year 1961, Carra A. Raulie, and William W. Raulie and Irene F. Raulie together lived on the farm already herein described, which was then owned by Carra A. Raulie, and that William W. Raulie and Carra A. Raulie are brothers; denied that 'William W. Raulie knew of the indebtedness owed to the United States by Carra A. Raulie' or 'knew that repeated demands for the payment of such indebtedness had been made by the United States upon Carra A. Raulie,' but added an allegation that if William W. Raulie had such information, knowledge to that effect was immaterial to the rights and interests of Carra A. Raulie; admitted that on October 4, 1961 a demand letter for the payment of his indebtedness to the United States was mailed to him by the United States Attorney for the District of New Mexico, and that on October 11, 1961 he executed a Warranty Deed to William W. Raulie conveying to William W. Raulie the land above described, which was filed for record and recorded in the office of the County Clerk of Curry County, New Mexico, on the day of its execution, of which deed a copy is attached to the plaintiff's complaint; denied that the Warranty Deed by him on October 11, 1961 executed and delivered to William W. Raulie did not represent a bona fide transaction, and, to the contrary, alleged that such transaction was made in entire good faith and for consideration, and that the title then conveyed was in his name and there were no liens or encumbrances of record, and that he was within his legitimate rights in vonveying the same despite the fact that he owed obligations to others, including the United States; and denied that after such conveyance he, Carra A. Raulie, continued to occupy the land and exercise control and dominion over it, and further denied that William W. Raulie accepted the deed of October 11, 1961 for the purpose of applying for a real estate loan from F.H.A. in order to help Carra A. Raulie refinance his indebtedness, and for the purpose of evading the levy of any execution upon the land and against Carra A. Raulie; denied that William W. Raulie did not become the owner of the land involved, supra, by virtue of the deed of October 11, 1961, or that William W. Raulie held title to such land in trust for the benefit of Carra A. Raulie and his creditors, and also denied that the defendants William W. Raulie and Irene F. Raulie knew the terms or limitations of any such alleged constructive trust; denied that on March 28, 1962, the United States Marshal attempted to levy, upon the land involved, an execution pursuant to the judgment in favor of the United States against Carra A. Raulie, or that Carra A. Raulie, and William W. Raulie, concealed from the Marshal the fact (which, as an alleged fact, he also denied) that Carra A. Raulie was the true owner of such land, and William W. Rauliemerely held the title to it in trust, or, by any such concealment and deception misled the Marshal into refraining from the making of such levy, or of the sale of such land under execution; denied his possession of any knowledge or information respecting the alleged execution after July 1, 1962 by William W. Raulie to and in favor of Ben H. Fletcher of a lease upon such land, or the extent of the right, if any, of Fletcher by virtue of such a lease, if any such lease there were, and in that behalf, affirmatively alleged that any such transactions, to borrow his exact verbiage, 'do not concern him as he was not a party to any such transactions and had parted with title to the real estate involved;' with respect to the allegations of the United States in its complaint, particularly in its paragraph No. 11, touching the execution and delivery on May 10, 1962 by William W. Raulie and Irene F. Raulie to John Foster Clingingsmith of a Warranty Deed of and respecting the land here involved, pleaded in the following language:
 
 
 32
 'Defendant alleges that he was not a party to said transactions alleged and neither admits nor denies the same, except that he specifically denies that William A. Raulie' (obviously meaning William W. Raulie throughout) 'held title to said lands as trustee for the benefit of Carra A. Raulie, this defendant, and his creditors; that at the time this defendant conveyed the property in question to defendant, William A. Raulie, there were no liens of record upon the same or any agreement made or demand for an agreement for a lien to be placed upon said property by any of the creditors of this defendant, including the present plaintiff' (i.e. the United States). 'That he was within his legal rights in conveying said property for consideration;'
 
 
 33
 disclaimed any part or participation, by him, in the execution by the defendants, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, his wife, on July 1, 1962 in favor of John Hancock Mutual Life Insurance Company of a mortgage on the real estate herein described in the principal sum of $30,000.00, and neither admitted nor denied the averments with respect thereto of the United States in its complaint. Finally, in such separate answer in respect of Count I of the complaint, Carra A. Raulie for alleged want of knowledge thereof or participation therein, refrained from admission or denial of the allegation of the United States concerning knowledge on the part of John Hancock Mutual Life Insurance Company of Carra A. Raulie's indebtedness to the United States, or the making upon him of demand for the payment thereof, or the entry of judgment therefor against him, but flatly and repetitively denied plaintiff's allegation that he had deeded the real estate involved in trust to William W. Raulie for the purpose of 'evading' his creditors, and that Carra A. Raulie knew that when William W. Raulie deeded such land to John Foster Clingingsmith, he said William W. Raulie was not the title owner thereof.
 
 
 34
 And the defendant, Carra A. Raulie, prayed in such separate answer for the denial of any relief in favor of the United States upon Count I of the plaintiff's complaint.
 
 
 35
 As to Count II of the complaint of the United States the defendant Carra A. Raulie in such separate answer, explicitly-- and, it would appear, correctly, took notice of the fact that the United States prayed for no relief against him in that count, and then merely reiterated by reference the positions by him theretofore taken in his separate answer as against the plaintiff's averments in Count I of the complaint, insofar as they or any of them had pertinence to Count II of the complaint.
 
 
 36
 Notice is now taken of the filing in the trial court, on July 29, 1963, by John Hancock Mutual Life Insurance Company of its duly served answer to the plaintiff's complaint, and of the subsequent filing on September 17, 1964 by United States of its Motion to Dismiss the action as against defendant John Hancock Mutual Life Insurance Company, and of the entry by the trial court, also on September 17, 1964 of an order dismissing the action as against that defendant, supra.
 
 
 37
 Similarly, notice is taken of the filing by the defendant Ben H. Fletcher (a) as of August 19, 1963 of his duly served answer to plaintiff's complaint, and (b) as of September 17, 1964 of his duly served Amended Answer; and as of September 21, 1965 of the filing by the plaintiff, United States of America, of its Motion to Dismiss the action as against the defendant, Ben H. Fletcher, and of the entry by the trial court, also on September 21, 1965, of an order dismissing the action as against that defendant, supra.
 
 
 38
 Accordingly, this court does not here reflect the positions thus advanced in their several pleadings by the defendants, John Hancock Mutual Life Insurance Company and Ben H. Fletcher, or by either of them. The dismissals as to those defendants simply eliminate them from the litigation.
 
 
 39
 On July 24, 1963, the defendants, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, husband and wife, and John Hancock Mutual Life Insurance Company, together, filed their ANSWER to the complaint of plaintiff United States of America, of which answer service had been made on July 23, 1963. In such answer, its makers, first as to Count I of the plaintiff's complaint, admitted that the defendants Clingingsmith resided at 8915 Devonshire Drive, Dallas, Texas, and that the defendant, John Hancock Mutual Life Insurance Company was licensed to do business in New Mexico, and subject to service of process as provided by the statutes of New Mexico; further admitted that on May 10, 1962, the defendants William W. Raulie and Irene F. Raulie, husband and wife, executed a warranty deed of the real estate herein involved to the defendant, John Foster Clingingsmith, which was filed for record on June 6, 1962, in the office of the County Clerk of Curry County, New Mexico, and is recorded in Book 111 of the Deed records in such office at page 148 thereof, and also that on July 1, 1962 John Foster Clingingsmith and his wife, Kathryn Evelyn Clingingsmith, executed a mortgage deed to the defendant John Hancock Mutual Life Insurance Company in the principal sum of $30,000.00, which mortgage deed was filed for record on July 5, 1962, and is recorded in Book 145 of the mortgage deed records, page 12, of the office of the County Clerk of Curry County, New Mexico. For asserted want of sufficient information as to certain items, and positively and categorically as to others, those answering defendants denied the allegations of plaintiff's complaint touching (a) the respective places of residence of the defendants, Carra A. Raulie, William W. Raulie, Irene F. Raulie and Ben H. Fletcher; (b) the involvement of Carra A. Raulie in indebtedness to the United States during the years, 1933 through 1940, and the plaintiff's reduction to judgment on January 31, 1962 of such indebtedness; (c) the ownership in 1961 of the real estate hereinbefore described by Carra A. Raulie, and the residence thereon of Carra A. Raulie, William W. Raulie and Irene F. Raulie, the relationship as brothers of Carra A. Raulie and William W. Raulie, and the knowledge by William W. Raulie of the indebtedness of Carra A. Raulie to the United States, and the demands upon Carra A. Raulie by the United States for its payment, including a demand letter therefor from the United States Attorney for the District of New Mexico; (d) the execution on October 11, 1961 by Carra A. Raulie to William W. Raulie of a warranty deed conveying to William W. Raulie such land, and the filing and recording of such deed also on October 11, 1961; (e) that the deed last mentioned did not represent a bona fide transaction for the alleged want of consideration for it; (f) the continuing occupancy of, and control and dominion over, such land by Carra A. Raulie; (g) William W. Raulie's acceptance of the deed to enable him to apply for a real estate loan from F.H.A. in order to help Carra A. Raulie refinance his indebtedness and to evade any execution against said real estate on account of a judgment against Carra A. Raulie; (h) the failure of William W. Raulie to become the owner of such land under the deed from Carra A. Raulie, and William W. Raulie's holding of such land in trust for Carra A. Raulie and his creditors, and the asserted knowledge by William W. Raulie and Irene F. Raulie of such alleged trust relationship; (i) the charged concealment from the United States Marshal by Carra A. Raulie and William W. Raulie of such asserted trust relationship for the purpose of misleading the Marshal into a failure to levy upon and sell such land under execution upon a judgment in favor of United States against Carra A. Raulie; (j) theexecution by William W. Raulie in favor of Ben H. Fletcher of a farm lease of such land; (k) John Foster Clingingsmith's knowledge, at the time of his acceptance of the deed of such land, that the grantor therein, William W. Raulie, was not the true owner of the land, but merely held the title thereto in trust for the benefit of Carra A. Raulie and his creditors, and that the deed to the defendant, John Foster Clingingsmith, was given and accepted in lieu of a mortgage, and to secure certain loans of money from Clingingsmith to Carra A. Raulie, and there was no bona fide sale of such land.
 
 
 40
 In the answer of the Clingingsmiths and John Hancock Mutual Life Insurance Company, those answering parties expressly admitted the plaintiff's allegation in the complaint that on July 1, 1962, John Foster Clingingsmith and his wife, Kathryn Evelyn Clingingsmith, executed a mortgage deed to the defendant, John Hancock Mutual Life Insurance Company, for $30,000.00, which mortgage deed was filed for record July 5, 1962, and is recorded in Book 145 of the mortgage deed records, at page 12, of the office of the County Clerk of Curry County, New Mexico; but also explicitly denied the plaintiff's allegation that the defendant, John Hancock Mutual Life Insurance Company knew that Carra A. Raulie was indebted to the United States, knew that demand had been made upon him for payment, knew that judgment had been rendered against him, knew that he had deeded the land in trust to William W. Raulie for the purpose of evading his creditors, and knew that when William W. Raulie deeded the land to John Foster Clingingsmith, William W. Raulie was not the true owner thereof, and that the deed from William W. Raulie to Clingingsmith was in effect a mortgage.
 
 
 41
 And in and by their ANSWER, so filed, the defendants John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, husband and wife, and John Hancock Mutual Life Insurance Company, as to Count I of the complaint of the United States, prayed that such first count be dismissed, and also prayed for their costs, and for general equitable relief.
 
 
 42
 In and by that ANSWER to the complaint of the United States, the makers thereof further made response to Count II of the complaint, and, responsive thereto, the defendants, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith and John Hancock Mutual Life Insurance Company, denied each and every allegation contained in the second count of the complaint, not theretofore admitted by such defendants in the portion of such answer responsive to Count I of the complaint, supra, and prayed that Count II of the complaint of the United States be dismissed, and for costs and for general equitable relief.
 
 
 43
 Again, this court recalls the dismissal of this action as to the defendant, John Hancock Mutual Life Insurance Company, and as to the defendant, Ben H. Fletcher, as against whom, it appears, no claim for relief is presented by the defendants Clingingsmith, and John Hancock Mutual Life Insurance Company, or any of them.
 
 
 44
 On September 14, 1965, resorting to Rule 15(a) Federal Rules of Civil Procedure, the defendants, Carra A. Raulie and William W. Raulie and Irene F. Raulie, his wife, filed a motion that the trial court enter an 'order permitting the filing of an amended answer' in this action, to which was endorsed a written consent of the United States, by its attorney. On the same day-- and apparently without further notice or consent-- an order was made and given by the trial court granting to those moving defendants 'fifteen days within which to file an amended answer herein.'
 
 
 45
 On October 14, 1965, the defendants, Carra A. Raulie, and William W. Raulie and Irene F. Raulie, his wife, filed in the trial court a pleading denominated FIRST AMENDED ANSWER, to which was appended a declaration of counsel asserting the mailing of 'a copy of the foregoing pleadings to opposing counsel of record this 14 day of October, 1965.' Actually, the pleading thus filed consisted of a so-called 'first amended answer' in two counts, of which each was followed by a prayer 'for judgment in the premises' and of a s0-called 'CROSS CLAIM,' at whose conclusion was a prayer also 'for judgment in the premises.' Synopses of those several segments of that pleading follow immediately.
 
 
 46
 Of that First Amended Answer, the 'first count' was ostensibly responsive directly to Count I of the complaint of the United States, supra. It included:
 
 
 47
 (a) the admission, in harmony with paragraph 3 of the complaint, that the place of residence of all three of the pleaders then was Route 1, Box 3, Texico, Curry County, New Mexico; (b) the admission, 'upon information and belief that the defendant, Carra A. Raulie, During the years 1933 through 1940, became indebted to the United States; that this indebtedness was reduced to judgment on January 31, 1962 (in United States District Court for the District of New Mexico) in Civil Action No. 4923, styled 'United States of America, Plaintiff, vs. Carra A. Raulie, Defendant,' the plaintiff being awarded a judgment in the sum of $3,148.88, with costs of $82.20;' (c) the admission that prior to October 11, 1961, the defendant, Carra A. Raulie was the owner in fee simple of the following described real estate: 'Lots 5 and 6, and the Southwest quarter of Section 3, T 2 N, R 37 E, and E 1/2 SE 1/4, Section 4 T 2 N, R 37 E, Curry County, New Mexico;' and that a deed, copy of which was and is attached to the complaint as Exhibit A was executed. Such Exhibit A is an ostensible copy of a Warranty Deed under date of October 11, 1961, whereby 'for consideration paid,' but in its amount not specified in the instrument, Carra A. Raulie, a single man, granted to William W. Raulie Lots Five (5) and Six (6) and the Southwest Quarter (SW 1/4) of Section Three (3), Township Two (2), Range Thirty-seven (37) and, East Half (E 1/2) of the Southeast Quarter (SE 1/4) of Section Four (4), Township Two (2), Range Thirty-seven (37), with the following reservation: 'This conveyance is subject to an indebtedness of Thirty-four Thousand Eight Hundred Sixty-three ($34,863.00) Dollars now against said above described real property;' (d) the admission that a deed dated May 10, 1962 was executed by William W. Raulie and Irene F. Raulie to John Foster Clingingsmith as is described in paragraph 11 of the complaint. The cited paragraph 11 describes the deed thus: '* * * on May 10, 1962, William W. Raulie and Irene F. Raulie executed a Warranty Deed to this property,' (i.e. the land last described, supra) 'to John Foster Clingingsmith, which was filed for record on June 6, 1962, in the County Clerk's Office of Curry County, New Mexico, in Book 111 of Deed Records, page 149.' (e) the affirmative allegation on the part of the pleaders that 'the conveyance by Carra A. Raulie to William W. Raulie and the latter' (probably intending, 'later') 'conveyance dated May 10, 1962 by William W. Raulie and Irene F. Raulie to John Foster Clingingsmith were, in each instance, for the sole purpose of obtaining a refinancing of certain mortgages and liens on the described real estate, including the lien of the plaintiff' (i.e. the United States); 'that the defendants John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, understood and agreed that the answering defendants were to retain their respective interests in said property, subject to any mortgages that were executed as incident to such refinancing;' and, (f) the general and unparticularized denial of each and every allegation of the complaint of the United States which conflicts with the affirmative allegations or admissions in subparagraph (a) to (e) hereofimmediately hereinbefore reflected.
 
 
 48
 The 'Second Count' of that First Amended Answer, ostensibly responsive to the Second Count of the complaint of the United States, merely,
 
 
 49
 (a) adopted by reference the admissions and affirmative allegations of the First Count of such First Amended Answer; and, (b) denied each and every allegation of the complaint of the United States which conflicts with the affirmative allegations or admissions already made in such First Amended Answer.
 
 
 50
 The 'Cross Claim' incorporated into the First Amended Answer, supra, was also tendered by the defendants, Carra A. Raulie, William W. Raulie, and Irene F. Raulie, and was directed against the defendants, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, husband and wife, and involved the real estate already described herein. The allegations of that Cross Claim are now set out.
 
 
 51
 The Cross Claim alleged that prior to October 11, 1961, Carra A. Raulie, also known as C. A. Raulie, was the owner of such land; that such land was then subject to certain mortgages and liens, in the total amount of approximately $34,868.00, and such mortgages and liens were in default, and Carra A. Raulie was unable to obtain financing, in consequence whereof, the mortgage and lien claimants were threatening to foreclose such encumbrances upon and against such land; that on October 11, 1961, Carra A. Raulie, believing that William W. Raulie, if title to such land were in his name, might refinance such mortgages and liens in such wise as to pay off the liens existing thereon, conveyed such land to William W. Raulie by Warranty Deed, of which a copy referred to in the Cross Claim, but attached to the complaint herein of the United States, discloses that, by it, Carra A. Raulie, a single man, conveyed to William W. Raulie the real estate hereinbefore described, 'subject to an indebtedness of Thirty-four Thousand Eight Hundred Sixty-three ($34,863.00) Dollars (see minor discrepancy in amount) now' (that is, at the date of such conveyance) against such real estate; that such conveyance to William W, Raulie was without consideration, except for the assumption of the existing indebtedness against such land and was upon the specific understanding and agreement that upon the obtaining of a loan sufficient to pay off the existing mortgages and liens thereon, such land would be reconveyed to Carra A. Raulie; that such deed of October 11, 1961 was accepted by William W. Raulie on the terms and conditions contained in the described agreement; that title to such land was to be held by William W. Raulie as trustee for Carra A. Raulie; that during the interval from October 11, 1961 to about May, 1962, William W. Raulie, as trustee, and Carra A. Raulie, personally attempted without success to obtain a refinancing of the mortgages on such land, in an amount sufficient to pay off all existing indebtedness, and that John Foster Clingingsmith was a source with whom contact for that purpose was made.
 
 
 52
 In said Cross Claim in such First Amended Answer, the pleaders then alleged that 'just prior to May 10, 1962,' the defendant John Foster Clingsmith agreed to assist the cross-claimants (obviously meaning Carra A. Raulie, William W. Raulie and Irene F. Raulie) in refinancing their loans on such land, which agreement was in substance as follows:
 
 
 53
 William W. Raulie, as trustee for Carra A. Raulie, and joined by his wife, Irence F. Raulie, would execute a deed to the heretofore described land to John Foster Clingingsmith. John Foster Clingingsmith would hold title as trustee for the benefit of Carra A. Raulie and only for the purpose of applying for a loan to be secured by such real estate in an amount sufficient to pay off all existing indebtedness against such real estate. If a loan could not be obtained in an amount sufficient to pay off all existing indebtedness, then John Foster Clingingsmith would personally advance such additional funds as were needed and would be reimbursed as to any amounts so advanced, plus interest thereon at the rate of ten percent per annum. Upon repayment of any amounts due cross-defendant (thereby apparently meaning John Foster Clingingsmith) such land would be reconveyed to Carra A. Raulie or William W. Raulie as their interests might appear, subject to any mortgage which might have been obtained by cross-defendant (again, apparently, meaning John Foster Clingingsmith) for the benefit of cross-claimants (thus meaning Carra A. Raulie and William W. Raulie.)
 
 
 54
 And the pleaders in that cross claim incorporated in such First Amended Answer, further alleged therein that pursuant to such agreement, William W. Raulie and his wife, Irene F. Raulie, executed a deed to John Foster Clingingsmith, dated May 10, 1962, in language set out in an exhibit attached to their pleading, which exhibit is a copy of a recorded Warranty Deed of William W. Raulie and wife Irene F. Raulie, bearing date of execution and of record, May 10, 1962, to John Foster Clingingsmith, and conveying to John Foster Clingingsmith the real estate above described 'for consideration paid,' and 'the further consideration of the assumption by John Foster Clingingsmith, grantee herein, of that certain First Mortgage to John Hancock Mutual Life Insurance Co., which has $18,000.00 (eithteen thousand dollars) principal balance at this time; and assumption of that certain SECOND MORTGAGE now owned and held by J. J. Steele, with the present principal balance in the amount of $14,490.24 (fourteen thousand four hundred ninety dollars and twenty-four cents).'
 
 
 55
 And such pleaders further alleged, in the cross claim incorporated in their pleading with their First Amended Answer, that thereafter John Foster Clingingsmith applied for and obtained a loan from the John Hancock Mutual Life Insurance Company in the amount of $30,000.00, which loan was secured by a mortgage on such land dated July 1, 1962; that the funds so obtained wereused to discharge certain of the mortgages and liens which had been filed against such land; and that additionally, John Foster Clingingsmith advanced certain funds to pay on said mortgages and liens in accordance with the alleged agreement of the parties (not exactly identified); but that the exact amount of the funds so advanced was unknown to the cross-claimants, (meaning thereby Carra A. Raulie, William W. Raulie and Irene F. Raulie), and then further asserted 'upon information and belief' that the cross-defendant (meaning John Foster Clingingsmith) breached his agreement by failing to advance all of the funds necessary to discharge obligations against the land 'including the obligation owed the plaintiff herein' (meaning the United States).
 
 
 56
 Finally, the pleaders in the cross claim incorporated in their First Amended Answer, and in paragraphs numbered respectively as follows, alleged that:
 
 
 57
 (9) The deed of May 10, 1962 from William W. Raulie and his wife to John Foster Clingingsmith was executed without consideration paid, except any amounts advanced by John Foster Clingingsmith, which, upon alleged information and belief, they assert not to have exceeded $7,500.00; and that as of that date the land had a reasonable value in excess of $100,00.00. (10) Since October 11, 1962, John Foster Clingingsmith had received certain funds from lease rental payments on the land involved to apply on the principal and interest due under his alleged agreement with Carra A. Raulie, William W. Raulie and Irene F. Raulie, the exact amount of which payments was unknown to the pleaders, but well known to John Foster Clingingsmith. Carra A. Raulie, William W. Raulie and Irene F. Raulie are entitled to an accounting for any amounts received by John Foster Clingingsmith in excess of the amounts paid on the mortgage to John Hancock Mutual Life Insurance Company, the amounts paid for taxes on the land, and any amounts advanced by John Foster Clingingsmith under his alleged agreement, plus interest thereon at the rate of ten percent per annum. (11) The pleaders, Carra A. Raulie, William W. Raulie and Irene F. Raulie have no adequate remedy at law. (12) There is a genuine controversy between the parties as to whether the deed of May 10, 1962 by William W. Raulie and Irene F. Raulie to John Foster Clingingsmith was intended as a deed or as a mortgage.
 
 
 58
 And the pleaders, in that cross claim incorporated in such First Amended Answer, concluded their statement of such CROSS CLAIM with a prayer for judgment in their behalf against John Foster Clingingsmith and Kathryn Evelyn Clingingsmith as follows:
 
 
 59
 (1) for judgment establishing their alleged interest in and to the foregoing land in accordance with the alleged 'agreement of the parties;' (2) for judgment decreeing the deed of May 10, 1962 from William W. Raulie and Irene F. Raulie, his wife, to John Foster Clingingsmith to be a mortgage, and establishing the alleged fee simple title of Carra A. Raulie and William W. Raulie as against the adverse claims of John Foster Clingingsmith and Kathryn Evelyn Clingingsmith; (3) for an accounting from the defendants John Foster Clingingsmith and Kathryn Evelyn Clingingsmith as to the moneys by them allegedly received by way of lease rental on such land, and for judgment for any amounts due Carra A. Raulie and William W. Raulie under the alleged agreement between the parties; and, (4) for such other and further relief as may be just and equitable in the premises.
 
 
 60
 On November 17, 1965, the defendants, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith served, and on November 18, 1965, they filed in the trial court, their ANSWER to the foregoing cross claim of the defendants, Carra A. Raulie and William W. Raulie and Irene F. Raulie, and, in the same pleading their own COUNTER-CLAIM against Carra A. Raulie, William W. Raulie and Irene F. Raulie. That ANSWER, so denominated, first, responded directly to the averments of the cross claim of Carra A. Raulie, William W. Raulie and Irene F. Raulie, then tendered four asserted affirmative defenses to such cross claim, all now briefly recalled.
 
 
 61
 By way of direct response to such cross claim, the defendants John Foster Clingingsmith and Kathryn Evelyn Clingingsmith (1) expressly denied every allegation in such cross claim not in that Clingingsmith answer specifically admitted; then (2) admitted (a) that the cross claim relates to the real property that is the subject of 'the original action herein' i.e. to the land hereinbefore described; (b) that prior to October 11, 1961 Carra A. Raulie was the owner of such land; and (c) that on October 11, 1961 such land was subject to certain liens and mortgages in the total approximate amount of Thirty-five Thousand Eight Hundred Dollars ($35,800.00), and that on said date Carra A. Raulie conveyed said land 'to cross-plaintiffs, William W. Raulie, et ux, by Deed attached as Exhibit A to the cross claim of crossplaintiffs, Carra A. Raulie, et al;' (This court pauses here to signify its impression, from the record before it, that the immediately foregoing quoted excerpt from such admission was and is inexact in two respects. In the first place, the 'Exhibit A' thus mentioned is not an 'exhibit to the cross-claim', but is rather an exhibit, so identified, to the original complaint herein of the United States, and merely referred to in paragraph 4 of the cross claim without explicit incorporation as an exhibit to that cross claim. In the second place, it appears to be quite inaccurate to refer to any conveyance by the deed thus mentioned, to 'William W. Raulie, et ux.' for the copy of deed attached as Exhibit A to the complaint of the United States seems clearly to disclose a conveyance to William W. Raulie, and to him alone.); next, denied for want of sufficient information, the allegations of the cross claim (3) that the amount of mortgages and other liens on the land prior to October 11, 1961 was approximately $34,868.00; that such mortgages were in default, and because of Carra A. Raulie's inability to obtain financing, the mortgage and lien claimants were threatening foreclosure against the land; (4) that on October 11, 1961 Carra A. Raulie, believing that his brother, William W. Raulie, if title to such land were in his name might refinance the loans and mortgages thereon so as to pay off existing liens, conveyed such land to William W. Raulie by warranty deed, attached to the complaint of the United States as Exhibit A (see references et supra et infra to that deed); that such deed was without consideration except for the assumption of existing indebtedness against said land, and was upon the alleged specific understanding and agreement that upon the obtaining of a loan sufficient to pay off existing mortgages and liens, the land would be reconveyed to Carra A. Raulie; that such deed was accepted by William W. Raulie upon the terms and conditions of such alleged described agreement; that such land was to be held by William W. Raulie as trustee for Carra A. Raulie; and that from October 11, 1961 to about May, 1962, William W. Raulie, as trustee, and Carra A. Raulie, personally, attempted without success to obtain a refinancing of the mortgages on such land, in an amount sufficient to pay off all existing indebtedness; and that John Foster Clingingsmith was a source contacted for that purpose.
 
 
 62
 Finally, in the direct responses (in their answer to such cross claim) to the averments of the cross claim of Carra A. Raulie, William W. Raulie and Irene F. Raulie, the defendants John Foster Clingingsmith and Irene F. Clingingsmith (reserving admissions in respect of their obtaining of a mortgage loan for $30,000.00 upon the land, and in respect of their receipt of certain rental payments shortly hereinafter set out) categorically denied 'the allegations contained in paragraphs 7, 8, 9, 10, 11 and 12 of the cross claim of Carra A. Raulie, William W. Raulie and Irene F. Raulie.' Let it be understood, in the ministry of brevity, that such several and successive six paragraphs are those paragraphs of the cross claim, of which, in this opinion a summarization has already herein been set out, which begins with the allusion to the allegation of the pleaders in said cross claim to the asserted effect that 'just prior to May 10, 1962,' the defendant, John Foster Clingingsmith agreed to assist the cross claimants (obviously meaning Carra A. Raulie, William W. Raulie and Irene F. Raulie) in refinancing their loans on such lands, etc., supra, and continues uninterruptedly through this opinion's reflection of the substance of paragraph numbered 12 of that cross claim, supra. Let it be understood, therefore, without needless repetition that, except for the admission next hereinafter disclosed, the defendants John Foster Clingingsmith and Kathryn Evelyn Clingingsmith have thereby denied, and do deny, each and all of those thus identified allegations of the cross claim of Carra A. Raulie, William W. Raulie and Irene F. Raulie.
 
 
 63
 Excepted from that denial is the express admission by the defendants, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, 'that William W. Raulie and wife, Irene F. Raulie, executed a Warranty Deed to John Foster Clingingsmith dated May 10, 1962, and that cross-defendants' (meaning John Foster Clingingsmith and Kathryn Evelyn Clingingsmith) 'obtained a loan in the amount of Thirty Thousand Dollars ($30,000.00) from John Hancock Mutual Lite Insurance Company, which was secured by a mortgage dated July 1, 1962; that cross-defendants' (again meaning John Foster Clingingsmith and Kathryn Evelyn Clingingsmith) 'also admit that they have received certain rental payments on the subject property, but specifically deny that Cross-Plaintiffs' (meaning Carra A. Raulie, William W. Raulie and Irene F. Raulie) 'are entitled to any of such sums.'
 
 
 64
 Besides those direct responses in their answer to such cross claim, the defendants, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, further set out in their answer to such cross claim, four separately asserted Affirmative Defenses which are now briefly disclosed as follows:
 
 
 65
 FIRST: That the cross-claimants, Carra A. Raulie, William W. Raulie and Irene F. Raulie, have failed to state in said cross claim a claim for which relief may be granted; SECOND: Still denying that John Foster Clingingsmith and Kathryn Evelyn Clingingsmith at any time had an agreement with Carra A. Raulie, William W. Raulie and Irene F. Raulie or any of them, that they (the Clingingsmiths) held the land in trust for the cross-claimants, Carra A. Raulie, William W. Raulie and Irene F. Raulie; alleged that the cross-claimants Carra A. Raulie, William W. Raulie and Irene F. Raulie, although seeking equity, come into this court with 'unclean hands,' in that they themselves alleged, in numerous respects, a conspiracy by them to defraud third parties, briefly identified, first, in Carra A. Raulie's conveying the land to William W. Raulie with the understood purpose of allowing the latter to obtain a loan for which Carra A. Raulie could not legally qualify; secondly, by their own contention that the conveyance by William W. Raulie and wife to John Foster Clingingsmith was for the sole purpose of obtaining a loan for which neither Carra A. Raulie nor William W. Raulie could legally qualify, in connection wherewith Carra A. Raulie and William W. Raulie have alleged that immediately on obtaining such loan, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith were to reconvey to Carra A. Raulie and William W. Raulie, or one of them, whereby they seek to have the trial court be a party to deceptive and wrongful acts; THIRD: (a) By sundry written instruments, identified at length as of June 27, 1962, a Lease-Purchase agreement; as of July 2, 1963, a lease agreement, as of November 27, 1963, a sharecrop agreement; and as of October 2, 1964, William W. Raulie and Irene F. Raulie have repeatedly and consistently recognized the title to the land as being vested in John Foster Clingingsmith; (b) By sundry identified pleadings in this litigation, especially by their initial answers to the original complaint, supra, Carra A. Raulie and William W. Raulie have denied that the involved land was owned and held in trust by William W. Raulie for Carra A. Raulie, and have also denied that the deed of May 10, 1962 from William W. Raulie and Irene F. Raulie to John Foster Clingingsmith was intended as a mortgage, and have alleged that such conveyance to John Foster Clingingsmith was made for good and valuable consideration. The cross-claimants Raulie, having recognized title to the land in John Foster Clingingsmith, supra, in a series of transactions from June 27, 1962, through October 2, 1964, have therefore brought before the court a stale claim or demand, and are guilty of laches. FOURTH: The First Amended Answer and the Cross Claim of Carra A. Raulie, William W. Raulie and Irene F. Raulie constitute sham and frivolous pleadings, and should be stricken pursuant to Rule 11, Federal Rules of Civil Procedure.
 
 
 66
 The defendants, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, thereupon concluded their responsive pleading to the First Amended Answer of the defendants Carra A. Raulie, William W. Raulie and Irene F. Raulie, and to the cross claim of the defendants Carra A. Raulie, William W. Raulie and Irene F. Raulie, tendered with such First Amended Answer, by a prayer that said First Amended Answer be stricken, and that said cross claim be dismissed, and for the recovery of their own costs, and such other and further relief as to the court may seem meet and proper.
 
 COUNTER-CLAIM of defendants Clingingsmith
 
 67
 Under a common cover with their answer just explained, the defendants John Foster Clingingsmith and Lathryn Evelyn Clingingsmith, tendered to the court, on their own part, a COUNTER-CLAIM, against the defendants Carra A. Raulie, William W. Raulie and Irene F. Raulie, wherein they made these averments:
 
 
 68
 1. An allegation that they are residents of the State of Texas; and that Carra A. Raulie, William W. Raulie and Irene F. Raulie are residents of the State of New Mexico. The pleaders were silent upon the subject of citizenship, which is what matters, if they be aiming at the assertion of an independent basis of jurisdiction in the trial court. Title 28 U.S.C. 1332(a)(1);
 
 
 69
 2. John Foster Clingingsmith is the owner, in community with his wife, Kathryn Evelyn Clingingsmith, in fee simple and in possession, of the real estate herein involved; and
 
 
 70
 3. As the Clingingsmiths are informed and believe, Carra A. Raulie, William W. Raulie and Irene F. Raulie, claim some right, title and interest in such real estate; such claim is, or claims are, without foundation or right in law or in equity; and the Clingingsmiths are entitled to the full possession and title in fee simple, of and to, said real estate, as against any and all of the claims of Carra A. Raulie, William W. Raulie and Irene F. Raulie.
 
 
 71
 And the defendants, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith prayed that their claim and estate in and to said real estate be established against the adverse claims of any and all of Carra A. Raulie, William W. Raulie and Irene F. Raulie; that each and all of such adverse claimants be forever barred and estopped from having or claiming any right, title or interest in or to such real estate, adverse to the Clingingsmiths; that the right and title of the Clingingsmiths in and to such real estate be quieted and set at rest; and that the Clingingsmiths be adjudged to be the owners in fee simple of such real estate, and awarded such further relief as may be equitable and proper.
 
 
 72
 On November 24, 1965, the defendants, Carra A. Raulie, William W. Raulie and Irene F. Raulie filed in the trial court their reply, served on November 22, 1965, to that counter-claim of the defendants, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, and, therein, (a) admitted the allegations of paragraphs 1 and 3 immediately above, and denied the allegations of paragraph 2 immediately above. Parenthetically, but realistically, this court is prepared to believe that their admission of so much of paragraph 3 of the counter-claim as pejoratively assailed the merits of the alleged claim of right, title or interest of the defendants, Carra A. Raulie, William W. Raulie and Irene F. Raulie (vide supra) was probably inadvertent and unintended.
 
 
 73
 And by their reply the defendants, Carra A. Raulie, William W. Raulie and Irene F. Raulie prayed for the dismissal of the counter-claim (or cross-claim) at the expense of the makers of such counter-claim (or cross-claim), that is to say at the expense of the defendants, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith.
 
 
 74
 The foregoing detailed disclosure of the successive pleadings in this litigation has been made, to the end that it may promote an adequate understanding of the positions which the contending parties to the case have thus severally taken, and of the context of those several positions. It may thereby provide a framework within which one may measure the consistency wherewith such positions have been asserted and by which the supporting evidence responsive to them adduced upon the trial may be tested on the score of its credibility and probative significance, and was presumptively so tested by the trial court.
 
 
 75
 Trial of the action upon its merits was conducted in the United States District Court for the District of New Mexico without a jury, the Honorable Howard C. Bratton, one of the judges of such court, presiding, on December 20 and 21, 1965.
 
 
 76
 Following an informally announced foreshadowing by the trial judge of his ruling upon the merits of the case, offered at the close of the trial, and, consistently therewith, the trial court, on January 21, 1966, made and caused to be filed herein its FINDINGS OF FACTS AND CONCLUSIONS OF LAW, and entered and caused to be filed its JUDGMENT, in the action. Those rulings were directly and concisely expressed; and, instead of being summarized with possible inaccuracy, are now set out in full.
 
 
 77
 The FINDINGS OF FACT AND CONCLUSIONS OF LAW follow:
 
 
 78
 'UNITED STATES OF AMERICA, Plaintiff vs. CARRA A. RAULIE, WILLIAM W. RAULIE and IRENE F. RAULIE, husband and wife, and JOHN FOSTER CLINGINGSMITH and KATHRYN EVELYN CLINGINGSMITH, husband and wife, Defendants
 
 No. 5380 CIVIL
 FINDINGS OF FACT AND CONCLUSIONS OF LAW
 
 79
 The above entitled and numbered cause came on regularly for trial and the Court having duly considered the evidence and argument of counsel and being fully advised in the premises now makes these its findings of fact:
 
 FINDINGS OF FACT
 
 80
 1. That Defendants and Cross-Plaintiffs, Carra A. Raulie and William W. Raulie and wife, Irene F. Raulie are citizens of Curry County, New Mexico; and Defendants and Cross-Defendants, John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith, are citizens of Dallas County, Texas. The amount in controversy exceeds $15,000.00 exclusive of interest and costs.
 
 
 81
 2. That William W. Raulie never made any statement or representation to the United States of America or its agents as to the ownership of the land in question.
 
 
 82
 3. That the United States of America did not file a lis pendens, abstract of judgment or other lien against the land in question, being approximately 301.23 acres located in Curry County, New Mexico, prior to the purchase of same by John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith.
 
 
 83
 4. That neither John Foster Clingingsmith nor Kathryn Evelyn Clingingsmith were aware of the claim asserted by the United States of America in this suit at the time they purchased the land in question on May 10, 1962.
 
 
 84
 5. That Carra A. Raulie transferred the property in question to William W. Raulie by deed dated October 11, 1961.
 
 
 85
 6. That the records in the County Clerk's office in Curry County, New Mexico, on May 10, 1962, reflected William W. Raulie as the owner of the land in question.
 
 
 86
 7. That at all times pertinent hereto Carra A. Raulie and William W. Raulie represented to John Foster Clingingsmith that William W. Raulie was the owner of the land in question.
 
 
 87
 8. That it was agreed between John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith, and William W. Raulie and wife, Irene F. Raulie, Carra A. Raulie and Ray Raulie, that the 301.23 acres of land in Curry County, New Mexico, which is in question would be sold to John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith in consideration of the payment of all indebtedness of record in Curry County, New Mexico, against said land and the forgiveness of certain debts owing to John Foster Clingingsmith by Carra A. Raulie and Ray Raulie. It was also understood and agreed between such parties that John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith, after receiving the deed to the abovesaid property from William W. Raulie and wife, Irene F. Raulie, would execute a lease to William W. Raulie and wife, containing an option to purchase. John Foster Clingingsmith and wife paid in full all consideration agreed upon for the purchase of the aforesaid land and did execute a lease to William W. Raulie, et ux Irene F. Raulie, as called for in said agreement.
 
 
 88
 9. That by deed dated May 10, 1962, William W. Raulie and wife, Irene F. Raulie, executed and delivered a deed to the land in question to John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith. Then on June 27, 1962, John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith, as lessors, and William W. Raulie and wife, Irene F. Raulie, as lessees, executed a lease containing an option to lessees to purchase the leased premises on the terms and conditions therein set forth.
 
 
 89
 10. That because William W. Raulie and wife, Irene F. Raulie, were unable to farm the land in question under the lease of June 27, 1962, and to secure from John Foster Clingingsmith an advance of monies in the sum of $2,000.00, it was agreed by and between Lessors, John Foster Clingingsmith, et ux, and William W. Raulie, et ux, that the lease of June 27, 1962, would be cancelled and considered void and the parties then entered into the lease of July 2, 1963, which was substituted in lieu of the prior lease agreement.
 
 
 90
 11. That William W. Raulie and wife could not farm the land and perform under the July 2, 1963, lease agreement, and the parties thereupon renegotiated the lease, voiding the lease of July 2, 1963, and entering into the share crop agreement of November 27, 1963. John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith, fully performed their obligations under the share crop agreement, but William W. Raulie and wife, Irene F. Raulie, wholly failed to perform under said agreement and breached same, to the damage of John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith. It was agreed in the execution of the abovesaid share crop agreement that all prior leases would be void and that William W. Raulie and wife, Irene F. Raulie, would no longer have an option to purchase the land in question, and that their sole rights in connection with the land were as contained in said agreement.
 
 
 91
 12. That it was never agreed or intended that the deed dated May 10, 1962, from William W. Raulie and wife, Irene F. Raulie, to John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith, was to act as a mortgage, nor was there an agreement that the land would be conveyed to William W. Raulie or Carra A. Raulie except as contained in the lease agreements of June 27, 1962 and July 2, 1963. Further, that there is no existing lease agreement between John Foster Clingingsmith and William W. Raulie or Carra A. Raulie.
 
 
 92
 13. That Carra A. Raulie was at all times aware of the terms of the transactions between William W. Raulie and John Foster Clingingsmith, and authorized William W. Raulie to enter into such transactions and to execute the deed of May 10, 1962, the leases of June 27, 1962 and July 2, 1963, and the share crop agreement of November 27, 1963, and ratified and approved such transactions.
 
 
 93
 14. That William W. Raulie and wife, Irene F. Raulie, recognized all right and title in and to the subject 301.23 acres, more or less, in Curry County, New Mexico, in John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith, by execution of the deed dated May 10, 1962, and the execution of the lease agreements of June 27, 1962, July 2, 1963 and November, 1964, and the share crop agreement of November 27, 1963; and Carra A. Raulie recognized title in and to the abovesaid lands to be in John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith, by virtue of his authorization to William W. Raulie and wife, Irene F. Raulie, to enter into the abovesaid deeds and agreements and his participation in the negotiation of such transaction, and William W. Raulie and wife, Irene F. Raulie, and Carra A. Raulie first raised a claim or interest in and to the aforesaid land adverse to Johm Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith, on October 14, 1965.
 
 CONCLUSIONS OF LAW
 
 94
 1. That the United States of America has no claim against William W. Raulie and wife, Irene F. Raulie or John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith.
 
 
 95
 2. That the United States of America does not have a valid lien or claim against the following described land in Curry County, New Mexico:
 
 
 96
 Lots 5 and 6 and the SW 1/4 of Section 3, Township 2 North, Range 37 East, N.M.P.M. and E 1/2 SE 1/4 of Section 4, Township 2 North, Range 37 East, N.M.P.M., all situated in Curry County, New Mexico.
 
 
 97
 3. That Carra A. Raulie, William W. Raulie and wife, Irene F. Raulie, are estopped to deny that good title in and to the land in question was conveyed by William W. Raulie and wife, Irene F. Raulie, to John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith, by the deed dated May 10, 1962.
 
 
 98
 4. That Carra A. Raulie, William W. Raulie and wife, Irene F. Raulie, are barred and estopped from having or claiming any right, title or interest adverse to John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith, in and to the following described premises:
 
 
 99
 Lots 5 and 6 and the SW 1/4 of Section 3, Township 2 North, Range 37 East, N.M.P.M. and E 1/2 SE 1/4 of Section 4, Township 2 North, Range 37 East, N.M.P.M., all situated in Curry County, New Mexico.
 
 
 100
 5. The United States shall not recover costs of suit. The costs of the defendants, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, shall be taxed against Carra A. Raulie, William W. Raulie and Irene F. Raulie.
 
 
 101
 All Requested Findings of Fact and Conclusions of Law not given above are denied.'
 
 The JUDGMENT follows:
 
 102
 'UNITED STATES OF AMERICA, Plaintiff vs. CARRA A. RAULIE, WILLIAM W. RAULIE and IRENE F. RAULIE, husband and wife, and JOHN FOSTER CLINGINGSMITH and KATHRYN EVELYN CLINGINGSMITH, husband and wife, Defendants
 
 NO. 5380 CIVIL
 JUDGMENT
 
 103
 The above entitled and numbered action came on for trial before the Court without a jury on December 20, 1965, at Albuquerque, New Mexico, Plaintiff, United States of America, appearing by and through its agent and attorney, John Quinn, United States Attorney for the District of New Mexico, and Defendants and Cross-Plaintiffs and Cross-Defendants, William W. Raulie, who is also known as W. W. Raulie, Irene F. Raulie, his wife, and Carra A. Raulie, who is also known as C.A. Raulie, appearing in person and by and through their attorneys, Lynell G. Skarda and Charles Spann of Grantham, Spann & Sanchez, and Defendants and Cross-Defendants and Cross-Plaintiffs, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, his wife, appearing in person and by and through their attorney, Vance Mauney of Botts, Botts & Mauney, and the Court having heard the pleadings and the evidence, and upon due consideration thereof, and the Court having filed its Findings of Fact and Conclusions of Law, and Order for Judgment, now, pursuant to said Order for Judgment,
 
 
 104
 IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Plaintiff, United States of America, take nothing by this action; and
 
 
 105
 IT IS FURTHER ORDERED AND ADJUDGED that Cross-Plaintiffs, William W. Raulie and wife, Irene F. Raulie, and Carra A. Raulie, take nothing under their cross-action herein; and
 
 
 106
 IT IS FURTHER ORDERED AND ADJUDGED that Defendants, Cross-Defendants and Cross-Plaintiffs, John Foster Clingingsmith and wife, Kathryn Evelyn Clingingsmith, have judgment against plaintiff, the United States of America, and against the Defendants, Cross-Plaintiffs and Cross-Defendants, William W. Raulie and wife, Irene F. Raulie, and Carra A. Raulie, and that as against any claim of the United States of America or the Cross-Defendants, William W. Raulie and wife, Irene F. Raulie, and Carra A. Raulie, the Defendant and Cross-Plaintiff, John Foster Clingingsmith, is the owner in community with his wife, Kathryn Evelyn Clingingsmith, in fee simple, in possession of and seized of an indefeasible estate in fee title in and to the following described real estate, to-wit:
 
 
 107
 Lots 5 and 6 and the SW 1/4 of Sec-3, Township 2 North, Range 37 East, N.M.P.M. and E 1/2 SE 1/4 of Section 4, Township 2 North, Range 37 East, N.M.P.M., all situated in Curry County, New Mexico,
 
 
 108
 and,
 
 
 109
 IT IS FURTHER ORDERED AND ADJUDGED that the United States of America shall not recover its costs, and that the costs of John Foster Clingingsmith and Kathryn Evelyn Clingingsmith are taxed against Carra A. Raulie, William W. Raulie and Irene F. Raulie.'
 
 
 110
 Thereafter, on March 21, 1966, separate notices of appeal from that judgment to this court were served and filed herein by:
 
 
 111
 a) the plaintiff, United States of America; and,
 
 
 112
 b) the defendants, Carra A. Raulie, William W. Raulie and Irene F. Raulie, uniting in a single notice.
 
 
 113
 The then contemplated appeal of the United States of America appears not to have been pursued or supported before this court. The defendants-appellants, Carra A. Raulie, William W. Raulie and Irene F. Raulie have proceeded with their appeal; and the case is presented to this court between them, as Defendants-Appellants, on the one hand, and, on the other hand, John Foster Clingingsmith and Kathryn Evelyn Clingingsmith, as Defendants-Appellees. It has been dely submitted by them upon the record and upon briefs and oral arguments. Thus submitted, it has received this court's consideration.
 
 
 114
 At the outset, this court recognizes the proper scope of, and limitation upon, its consideration and action as an appellate tribunal in the present case. It may not appropriately arrive at, or announce, a ruling independent of that of the trial court upon the merits of the litigation, and, thereupon, substitute its judgment for that of the trial court, and reverse the trial court's judgment, or so to speak, 'second guess' the trial court. It serves and acts, rather, and only, in the capacity of a reviewing court. An examination of the instructive authorities discloses the consistency of that course with the prevailing appellate practice, and its administration within this circuit. Without needless quotation from them, citation is offered of the following reported opinions of this court: Hanover Fire Insurance Company v. Isabel (10 Cir.), 129 F.2d 111, 113; Roscoe v. Hunter (10 Cir.), 144 F.2d 91, 92; Townsend v. Bucyrus-Erie Company, (10 Cir.), 144 F.2d 106, 109; Newell v. Phillips Petroleum Company, (10 Cir.),144 F.2d 338, 340; Baker & Company v. Lagaly, (10 Cir.), 144 F.2d 344, 347, 154 A.L.R. 1098; Cities Service Oil Company v. Harvey, (10 Cir.), 148 F.2d 780, 783; Atchison, Topeka & Santa Fe Railway Company v. Jarboe Livestock Commission Company, (10 Cir.), 159 F.2d 527, 529; Yates v. American Republics Corporation, (10 Cir.), 163 F.2d 178, 180; Wyoming Railway Company v. Herrington, (10 Cir.), 163 F.2d 1004, 1007; Boston Insurance Company v. Read, (10 Cir.), 166 F.2d 551, 553, 2 A.L.R.2d 1155; Fleming v. Kellett, (10 Cir.), 167 F.2d 265, 267; United States v. Chicago, Rock Island & Pacific Railway Company, (10 Cir.), 171 F.2d 377, 380; Widney v. United States, (10 Cir.), 178 F.2d 880, 884.[1]
 
 
 115
 A comparable position is adopted and administered in the Courts of Appeals of the other Circuits within the federal judicial system. Exhaustive citation to, and quotation from, reported opinions comprehensively selected would unduly expand this opinion. Representatively, however, the following quotation is offered from the opinion of Judge John B. Sanborn (Judges Woodrough and Riddick concurring) in Cleo Syrup Corporation v. Coca-Cola Company, (8 Cir.), 139 F.2d 416, 417, 418:
 
 
 116
 'This Court, upon review, will not retry issues of fact or substitute its judgment with respect to such issues for that of the trial court. Storley v. Armour & Co., 8 Cir., 107 F.2d 499, 513; Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199; Travelers Mut. Casualty Co. v. Rector, 8 Cir., 138 F.2d 396, 398. The power of a trial court to decide doubtful issues of fact is not limited to deciding them correctly. Thompson v. Terminal Shares, Inc., 8 Cir., 89 F.2d 652, 655; Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698, 701 (affirmed 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251); Travelers Mutual Casualty Co. v. Rector, supra. In a non-jury case, this Court may not set aside a finding of fact of a trial court unless there is no substantial evidence to sustain it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law. Aetna Life Ins. Co. v. Kepler, 8 Cir., 116 F.2d 1, 4, 5; Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199; Travelers Mutual Casualty Co. v. Rector, supra. The District Court, in making its findings, was under no misapprehension as to the applicable law. See Kann v. Diamond Steel Co., 8 Cir., 89 F.2d 706, 707; My-T Fine Corporation v. Samuels, 2 Cir., 69 F.2d 76, 77; Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U.S. 315, 335, 336, 59 S.Ct. 191, 83 L.Ed. 195. In determining whether there is a sufficient evidentiary basis for the court's findings of fact, we must take that view of the evidence and the inferences deducible therefrom which is most favorable to the plaintiff.'
 
 
 117
 From the same circuit and to essentially the same effect, see Rasmussen v. Gresly, (8 Cir.), 77 F.2d 252; Yutterman v. Sternberg, (8 Cir.), 86 F.2d 321, 324, 111 A.L.R. 736 (inclusive even of its quoted rhetorical venture into decisional reasoning); Pendergrass v. New York Life Insurance Company, (8 Cir.), 181 F.2d 136, 137; Dierks Lumber & Coal Company v. Barnett, (8 Cir.), 221 F.2d 695, 696, 697; Blackhawk Hotels Company v. Bonfoey, (8 Cir.), 227 F.2d 232, 235, 56 A.L.R.2d 1047.
 
 
 118
 Attention is also recalled to the fact that this case was 'tried upon the facts without a jury.' In such a circumstance, it is, and at the time of that trial was, provided by Rule 52(a), Federal Rules of Civil Procedure that: 'In all actions tried upon the facts without a jury * * * the court, shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment; * * *. Findings of Fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesse.' The harmony between that rule and the several judicial opinions lately herein cited is too obvious to warrant a formal demonstration by this court. It is merely repeated that, in the way of its administration of the rule, the trial court did 'find the facts specially and state separately its conclusions of law,' and that it directed the entry of the appropriate judgment. So, acknowledging, and in patent recognition of the rule, the appellants in their brief and oral argument poise their appeal upon the contention that the findings of fact are 'clearly erroneous.'
 
 
 119
 With the contention just adverted to this court disagrees. In that course, it is quite aware of the definition of 'clearly erroneous,' advanced by the Supreme Court in United States v. United States Gypsum Company, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. It was there said that 'a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' This court is persuaded that, in the litigation before it, the deliverance of the trial court did not involve the commission of any mistake. By that conclusion, this court does not declare that there was no dispute in the evidence before the trial court. The record discloses some evidence supportive of the position of the appellants. But the trial judge was conscious of the respective positions of the contending parties and dealt with them upon the basis of the evidence, both documentary and oral, with which, so recently presented before him, he was thoroughly familiar.
 
 
 120
 At this juncture, it is recalled that there is evidence before the court, produced largely by the defendants-appellants, but not actually disputed, to the effect that at the time of trial Carra A. Raulie was sixty-eight years of age, William W. Raulie was sixty-seven and Ray Raulie was fifty-eitht. By a reduction of approximately three and one half years, they would respectively have been approximately, but not exactly, sixty-four and one-half, sixty-three and one-half, and fifty-four and one-half years of age on May 10, 1962. As has already been noted herein, the three brothers and the wife of William W. Raulie lived in the dwelling house on the subject land. At least, they all regarded it as 'home,' from which, if they occasionally were absent, such withdrawal was 'cum animo revertendi.'
 
 
 121
 But there is also evidence that the Raulie brothers pursued different occupations. Carra A. Raulie, for his livelihood, dealt in the 'oil and gas and securities' business, and principally in Texas. Ray Raulie was engaged in the 'trucking' business, doing general hauling, but with emphasis on grain and produce, and personally operating with a truck which he owned. William W. Raulie, who, during the trial, testified that he had then liven on the land here involved for twenty-three years, was and is a farmer and conducted the farming operations on the subject land, occasionally at least, with the personal assistance of Carra A. Raulie, and possibly Ray Raulie. But the two brothers last named appear not to have been, or to have claimed to be, operating farmers.
 
 
 122
 On and immediately before May 10, 1962, the land in suit was heavily encumbered, et supra et infra; and the three Raulie brothers were also individually burdened by pressing indebtedness. Evidence fairly supports the declaration just made, and it is unquestioned. Of such indebtedness, and in considerable aggregate amount, some had been reduced to judgment.
 
 
 123
 The Defendants-Appellants, Carra A. Raulie, William W. Raulie and Irene F. Raulie, in their submission of the present appeal, and in support of their quest of the reversal of the judgment herein, supra, contend:
 
 
 124
 First, that the undisputed evidence established that the deed dated May 10, 1962 from the appellants, William W. Raulie and Irene F. Raulie to John Foster Clingingsmith, appellee, was given as security for money to be loaned, and the performance of a condition (i.e. in substantial part, the refinancing of the John Hancock Mutual Life Insurance Company loan, secured by a first mortgage on the land) and was, therefore, a mortgage; and,
 
 
 125
 Secondly, that the Raulies, as mortgagors were entitled to an equity of redemption which they did not release under any valid agreement between the parties.
 
 
 126
 The 'deed dated May 10, 1962 from William W. Raulie and Irene F. Raulie,' as the record herein shows, was and is a deed expressly declared to be 'with warranty covenants' whereby, 'for consideration paid * * * and the further consideration of the assumption by John Foster Clingingsmith, grantee herein of that certain First Mortgage to John Hancock Mutual Life Insurance Co., which has $18,000.00 (eighteen thousand dollars) principal balance at this time; and assumption of that second mortgage now owned and held by J. J. Steele, with the present principal balance in the amount of $14,490.24, (fourteen thousand four hundred ninety dollars and twenty-four cents),' William W. Raulie (then the owner of record of the land herein described), together with his wife, Irene F. Raulie, conveyed such land to John Foster Clingingsmith, insofar as that instrument is concerned, without condition, reservation or restriction, but subject, of course, to the liens of the several mortgages to John Hancock Mutual Life Insurance Company and to J. J. Steele, whose assumption constituted an express portion, but only a portion, of the consideration for the instrument. It was, therefore, 'an absolute Warranty Deed in usual form.' Indeed, it is not considered that the defendants-appellants contend otherwise. In passing, it is also observed that the debt to J. J. Steele, supra, was represented not by one mortgage, but by two mortgages, one a second lien, the other a third lien.
 
 
 127
 After the execution of the deed of May 10, 1962, and on June 27, 1962, John Foster Clingingsmith, on the one part (designated as 'lessor') and William W. Raulie and Irene F. Raulie on the other part (designated as 'lessees') entered into a written agreement in writing wherein (1) Mr. Clingingsmith leased the foregoing land to William W. Raulie and Irene F. Raulie 'for the term * * * of ten (10) years and two months' commencing June 1, 1962 and ending July 31, 1972, for cash rent payable in identified installments on August 1 and January 1 of each year, beginning August 1, 1962 and ending on January 1, 1972, $2,000.00 on each August 1, commencing August 1, 1962, and prescribed amounts on each January 1, diminishing from $4,102.03 on January 1, 1963, annually by $90.00 until and including January 1, 1972, when that prescribed payment was to be $3,292.03; and (2) Mr. Clingingsmith granted to William W. Raulie and Irene F. Raulie an option, conditioned on the persistence in effect of the lease, 'to purchase up to one-fifth (1/5) of the leased property on the following dates' (identifying each January 1 from 1963 through 1972) 'for the respective amounts as set forth below' (specifying $150.00 per acre as of January 1, 1963 and diminishing by $5.30 per acre on each successive January 1, until January 1, 1972, on which the price was set at $102.30 per acre.) That option agreement contained a protective clause signifying Mr. Clingingsmith's intention, in the event of the lessees' exercise of their option of purchase, to pay off in the exercise of his mortgagor's reserved right so to do, a proportionate amount of the note and mortgage to John Hancock Mutual Life Insurance Company on the entire land, and to secure thereby a release of the property so to be purchased under the option, and also for a proportionate diminution of the rental under the lease from and after any such exercise of the option to purchase. Without complete quotation, it is here noted that in all respects Mr. Clingingsmith, as lessor, reserved the lien, and the lessor's protective rights, appropriate to, and customarily incorporated into leases of agricultural land with or without associated options to purchase in favor of the lessees.
 
 
 128
 It is observed, in connection with the lease of June 27, 1962, that as of December 27, 1962, William W. Raulie as 'lessor' executed a lease-- manifestly a sublease-- to Ben H. Fletcher as 'lessee' for the term of one year, beginning January 1, 1963 and expiring December 31, 1963 at a cash rental of $6,700.00, payable and paid in cash at the time of the execution of that instrument, in respect of the land in suit, with the exception of an identified two acres and 'the house, garage, barn and windmill' as improvements thereon. And there is evidence that Fletcher paid such rental to or for the use and benefit of John Foster Clingingsmith. Of that rental, the sum of $4,500.00 represented the purchase price of 89.9 acres of growing wheat on the land at the time of the execution of the sublease.
 
 
 129
 But on July 2, 1963 (thus relatively early in the term of the lease of June 27, 1962, and after the execution of the sublease to Fletcher, and, it is to be observed, on the day following the date of the institution of this suit by the United States) John Foster Clingingsmith, again as lessor, and William W. Raulie and Irene F. Raulie as lessees, executed an agreement in writing, at the outset whereof they declared 'that the agreement of June 27, 1962, is void and held for naught and that this is the only and existing lease agreement between these parties.' And, in and by that agreement, the lessor, Clingingsmith, leased to the lessees, William W. Raulie and Irene F. Raulie, the land here involved 'for the period of nine (9) years and one (1) month commencing July 1, 1963 and ending July 31, 1972.' That agreement, as did the instrument of June 27, 1962, included both a lease for a defined term, supra, and the grant of an option to purchase during the term of the lease quite comparable to the option in the earlier agreement, supra. Briefly stated, the lease then granted reserved to the lessor, Clingingsmith, and the lessees agreed to pay to him, as rental for the leased premises on each January 1, during the term beginning January 1, 1964 and ending on January 1, 1972, a specified and annually diminishing cash sum, the initial such payment being $4,432.82 and the final payment being $3,581.67, and on each August 1 during the term beginning August 1, 1964 and ending August 1, 1971, the exace sum of $2,000.00. And the option to purchase therein contained granted to William W. Raulie and Irene F. Raulie (if and while the lease should remain in existence) 'the right to purchase up to 1/5 of the leased property on each January 1, during the term of the lease, at a progressively descending price per acre beginning with $152.87 as of January 1, 1964 and terminating with $103.21,' the annual reductions in price per acre varying in different figures between $6.19 and $6.67 as the extremes. And the option phase of the instrument contemplated, as did the earlier one, supra, that in the event of an exercise of the option, the lessor, Clingingsmith, would prepay a proportionate amount of the John Hancock Mutual Life Insurance Company mortgage debt, and procure a release of that mortgage lien as to the land purchased under the option. And while there were provisions in the agreement of July 2, 1963, rather more austerely protective of the lessor, Clingingsmith, than the language of the lease of June 27, 1962, the provisions for the security of the lessor are comparable to those of the earlier lease, and of a character common to traditional farm leases.
 
 
 130
 Only four months, twenty-five days after the execution of the agreement last mentioned, (incidentally, four months, twenty-six days after the institution of this action by the United States), that is, on November 27, 1963, John Foster Clingingsmith, as 'landlord' and William W. Raulie and Irene F. Raulie as 'tenants' made and executed in respect of the land presently involved a SHARE CROP AGREEMENT. That agreement opened with a declaration by its makers that by it they were
 
 
 131
 'revoking and otherwise rendering null and void any and all agreements theretofore made of any kind or nature whatsoever whether oral or written between Landlord and Tenants.'
 
 
 132
 The term of that sharecrop agreement was declared to be 'for a period of one (1) year, commencing on the 1st day of December, 1963 and ending the 31st day of October, 1964.' The draftsman of the instrument might profitably have observed his calendar more closely. But no issue appears to have arisen from his error or its oversight by the parties.
 
 
 133
 By the Sharecrop Agreement, John Foster Clingingsmith, the landlord, furnished the land involved herein for farming purposes. By it, he further agreed:
 
 
 134
 (A) To loan to tenants the sum of three hundred fifty and no/100 DOLLARS ($350.00) per month at the first of each calendar month at the rate of 6% Interest per annum;
 
 
 135
 (B) To pay the taxes assessed against the property;
 
 
 136
 (C) To furnish all fertilizer and seed for all crops raised on the said property;
 
 
 137
 (D) To pay for all harvesting and hauling to market of wheat and any other crops raised on said property;
 
 
 138
 (E) To permit Tenants, at any time while this Agreement is in effect, or within a reasonable time thereafter, to remove minor improvements of a temporary nature which do not impair the condition or appearance of the land and provided said tenants leave in good condition that part of the land, buildings or improvements, from which such minor improvements are removed. However, this provision does not allow said Tenants to remove the Green Machinery irrigation pump, complete with eight 'column' rear head discharge pipe nor any of the irrigation equipment including the Chrysler industrial engine situated upon said property;
 
 
 139
 (F) To pay for any general or major overhaul of the irrigation pump and motor which from time to time may be required in order to keep said irrigation pump and motor in proper working order;
 
 
 140
 (G) To furnish all electricity and natural gas reasonably used in the operation of said premises, including the house and irrigation wells.
 
 
 141
 By the agreement thus identified the Tenants, William W. Raulie and Irene F. Raulie agreed:
 
 
 142
 (A) To farm the premises in a good and farmer-like manner, to care properly for all growing crops, to supervise the harvesting of all crops in proper season, and to see that all of the crops are marketed properly;
 
 
 143
 (B) To furnish all labor, equipment and expenses for the operation of the farm, including pick-ups, trucks, tractors, and all necessary farming equipment, including gas and oil used in said equipment, and all repairs of any nature on said equipment;
 
 
 144
 (C) To maintain the farm during the term of this agreement in as good condition and repair as at the beginning, or as later improved, normal wear and depreciation excepted; Tenants agree to furnish all materials, parts, replacements and labor, and all other costs for all maintenances of and repairs to any building, pipes, tubing, and any and all equipment attached to the irrigation engines, pumps, pipes, tubing, or used in conjunction therewith; and to any fences or other equipment attached to the realty, notwithstanding that said damage or destruction be caused by a fire, flood, or any other cause beyond the control of Tenants and said maintenance, replacement and/or labor shall be done as promptly as possible, Tenants agreeing to furnish all materials and labor for all maintenance and repairs, and to replace or repair any building that may be destroyed or damaged by a fire, flood or other cause, even though beyond the control of Tenants, as promptly as possible. And in this connection, it is understood and agreed between the parties that no adjustments will be allowed to Tenants at any time during the term of this agreement for any reason whatsoever;
 
 
 145
 (D) Not to commit waste or damage to the farm and to use due care to prevent others from so doing;
 
 
 146
 (E) To take for fuel or use on the farm only dead or unmarketable timber, or other timber designated by Landlord, and to sell no timber without written consent of Landlord;
 
 
 147
 (F) To permit Landlord or his agent to enter the farm at any reasonable time;
 
 
 148
 (G) Not to assign this Agreement or any part hereof without the written consent of the Landlord;
 
 
 149
 (H) To pay all phone bills that are charged to the phone located on the farm, and all phone bills originated by Tenants;
 
 
 150
 (I) To yield possession to Landlord at the expiration of the term of this Agreement, without further demand or notice, in as good order and condition as when the same was entered upon by the Tenants, ordinary wear and use excepted, and failing thereof to deliver up said premises, to pay to Landlord FIFTY ($50.00) DOLLARS per day for all the time they may continue in possession of said premises after the expiration of this agreement;
 
 
 151
 (J) In the event Landlord shall bring suit to recover for breach of any of the agreements herein on the part of the Tenants, or for the possession of the premises, Tenants shall pay to Landlord a reasonable attorney's fee, which sum shall be taxed by the court as part of the costs of such suit.
 
 
 152
 And by the Sharecrop Agreement, the parties to it mutually agreed that:
 
 
 153
 (A) Landlord shall have, in addition to the lien given him by law, a lien on all the property of the Tenants used or situated on the premises, whether said property is exempt from execution or not, for the whole amount of maney agreed to be shared by this Agreement; and in default of payment, Landlord may levy on said property, and sell it to pay said indebtedness;
 
 
 154
 (B) If Tenants shall fail to pay the full amount of money as hereinafter provided for at the time herein stipulated, or shall make default in any of their agreements herein contained, they shall forfeit all their rights under this Agreement, and the Landlord, by himself, or his agents, may, at his option take immediate possession of the premises, and may, if necessary, recover such possession by action of forcible entry and detainer, and in either of such events this agreement shall cease and come to an end, as if that were the day originally fixed herein for the expiration of the term hereof;
 
 
 155
 (C) Tenants shall not open up any charge accounts, or charge any merchandise, services or goods of any kind whatsoever to the account of the Landlord, except upon specific written authority of the Landlord;
 
 
 156
 (D) All payments as a result of diversion from production or other cause from the United States shall be paid to the Landlord. Tenant shall diligently perform all required farming operations on such diverted acreage, and shall be reimbursed at going custom rates in the community therefor;
 
 
 157
 (E) Landlord and Tenants shall share in the gross receipts from the sale of crops raised on the farm in the following ratio:
 
 
 158
 Landlord 66 2/3%
 
 
 159
 Tenants 33 1/3;
 
 
 160
 In addition all loans made during the term of this agreement by Landlord to Tenants shall be repaid out of the Tenants' share from the sale of crops;
 
 
 161
 (F) This agreement shall be binding on the parties hereto, their heirs, assigns and legal representatives;
 
 
 162
 (G) This agreement is assignable by Landlord, but Tenants may not assign their duties, rights and/or obligations hereunder without the written consent of Landlord, but Landlord's consent will not be unreasonably withheld to any such assignment desired to be entered into by Tenants.
 
 
 163
 Concurrently with the execution of the Sharecrop Agreement, William W. Raulie executed and delivered to and in favor of John Foster Clingingsmith his promissory note wherein and whereby he undertook to pay to the order of John Foster Clingingsmith, on or before November 1, 1964 the sum of $9251.95, with interest thereon from date, November 27, 1963 at the rate of six per cent per annum until maturity and, after maturity, at the rate of ten per cent per annum until paid.
 
 
 164
 On October 2, 1964, after the execution of the foregoing Sharecrop Agreement, and while the Sharecrop Agreement, according to its terms, supposedly had several years of operation, John Foster Clingingsmith, identified as 'lessor,' and William W. Raulie and Irene F. Raulie, as 'lessees,' made and entered into another agreement in writing. By it the lessor leased the land herein involved to the lessees for the term of one crop year, more exactly, 'through harvest of the wheat crop in the year 1965 and harvest of the maize crop in the year, 1965, wheat ground and maize ground each to be surrendered on completion of harvest of the respective crops,' in consideration whereof the lessees agreed to pay to lessor the sum of $7,500.00, in equal installments of $2,500.00 on or before November 2, 1964, June 1, 1965 and November 1, 1965, and further to pay the lessor $800.00 on or before November 2, 1964 for a 413 Chrysler motor located on the premises. By that lease, the lessees were also granted the right to continue, during the operation of the lease, to occupy the dwelling house on the premises (which they were occupying on October 2, 1964), all on condition that the lessees should pay the total sum of $3,300.00 on or before November 2, 1964, so payable by the terms of the agreement; failing in which payment, the lease should be void and the dwelling house should be vacated on or before December 31, 1964.
 
 
 165
 There was evidence before the trial court that the lessees in the immediately foregoing lease (at least William W. Raulie), at an imprecisely established date, agree with one Charlie Flynn to 'sublease' the lessees' rights in such lease, in whole or in part, to said Charlie Flynn. In any event, on October 31, 1964, twenty-nine days after the execution of the foregoing lease, another instrument, denominated, 'FARM LEASE,' was executed by the between John Foster Clingingsmith as 'Lessor,' Charlie Flynn as 'Lessee,' and by William W. Raulie and Irene F. Raulie, under description as 'Third Parties.'
 
 
 166
 Briefly summarized, that FARM LEASE AGREEMENT of October 31, 1964 provided that it was 'executed so as to override and replace a lease heretofore executed on the 2nd day of October, 1964 by and between John F. Clingingsmith, Lessor, and W. W. Raulie and Irene Raulie, his wife, Lessees, under which the Lessees therein agreed to pay the sum of $7,500.00, payable $2,500.00 on or before November 2, 1964, $2,500.00 on or before June 1, 1965, and $2,500.00 on or before November 1, 1965, and in which Lessees therein further agreed to pay the Lessor the sum of $800.00 on or before November 2, 1964 for the 413 Chrysler motor located on the premises,' (concerning which, see additionally the provision in the agreement or lease of October 31, 1964). And the agreement of October 31, 1964 further provided in substance:
 
 
 167
 1. that the lessor leased to the lessee the land herein involved, excluding and reserving therefrom the dwelling house, and 1.23 acres surrounding the same, 'which shall be retained by third parties under this lease, but which shall be included in any sale hereinabove (but in this summary set out in subparagraph 3, infra) referred to,' for the term of the crop year 1965, for a rental of $30.00 per acre payable on or before November 1, 1964.
 
 
 168
 2. that the Lessee have the option to renew the lease for additional terms of one year from year to year not to exceed four additional years, at a like annual rental per annum, by giving a written notice for each year;
 
 
 169
 3. that the lease should terminate after the crop harvest in any year in which the real estate should be sold by the lessor, but 'that the lessee shall have the option for 30 days after written notice thereof to him to purchase said real estate upon the same terms and conditions on which Lessor may be willing to sell;' that 'the dwelling house and 1.23 acres surrounding the same shall be included in any sale hereinbefore referred to;'
 
 
 170
 4. that the lessor should properly and in a workmanlike manner put down another irrigation well and approximately one quarter mile of underground pipe;
 
 
 171
 5. that the Lessee, Charlie Flynn, under the lease of October 31, 1964 'apply a total of $8,300.00[2] which is due under the terms of this lease to pay off the amounts owing under the October 2, 1964 lease between John F. Clingingsmith and W. W. Raulie and Irene Raulie, his wife, and that W. W. Raulie and Irene Raulie, his wife, are thereafter entitled to the remaining sum due from Charlie Flynn under the terms of this lease during the first year of its existence and that thereafter the sums due under this lease from Charlie Flynn will be paid in full to John F. Clingingsmith, Lessor under this lease, it being intended that the aforementioned lease of October 2, between John F. Clingingsmith, Lessor, and W. W. Raulie and Irene Raulie, his wife, Lessees, be paid up in order that this lease entered into on October 31, 1964, between John F. Clingingsmith, Lessor, and Charlie Flynn, can replace the aforementioned lease entered into on October 2, 1964, and that there will be no default by W. W. Raulie and Irene Raulie, his wife, under said lease, and Third Parties W. W. Raulie and Irene Raulie, his wife, herein agree that they will vacate the premises herein described, excluding the dwelling house and 1.23 acres surrounding same, when the terms and obligations under this lease go into effect.
 
 
 172
 In the submission to this court of the present appeal, there has been extended discussion, in behalf of both of the appellants and of the appellees, concerning the financial plight of William W. Raulie, and also of Carra A. Raulie and Ray Raulie, during the overall interval within which the several transactions occurred, which have been mentioned herein. And there is in the record before this court, including the transcript of the testimony upon the trial, and the numerous exhibits received therein, material relevant to that subject. Though broadly instructive, that material, is, not surprisingly, inexact and inconclusive. One may not declare from it, precisely what was the financial posture of any of the three brothers at any particular time, or compile a dependable financial balance sheet in respect of him.
 
 
 173
 There appears to be evidence from which it may be concluded that in the interval between 1943 when the mother of the Raulie family, and patentee of the land, died and her children thereby succeeded to its ownership, and October 11, 1961, and probably more pointedly, between August 21, 1957, when his brothers and sister conveyed their individual shares in the land to him, and October 11, 1961, when he executed the Warranty Deed of the land to William W. Raulie, Carra A. Raulie had become substantially indebted. Exactly how deeply he was financially involved may not be affirmed with assurance. But it is to be remembered that his Warranty Deed of the date last set down conveyed the land 'subject to an indebtedness of Thirty-four Thousand Eight Hundred sixty-three ($34,863.00) Dollars, now against said above described property.' And there is evidence that, beyond that figure, he owed to several creditors substantial personal indebtedness, the exact aggregate amount of which may not be declared with certainty. There is evidence in the present record supportive of the view that Carra A. Raulie's indebtedness, in association with his age and unmarried status, and the fact that he was not an active farmer, was a factor contributing to his resolution to convey, and to his actual conveyance on October 11, 1961 of the land to William W. Raulie upon the hypothesis that William W. Raulie, more probably than he, might be able to refinance the land, and thereby to retain it.
 
 
 174
 Ray Raulie is shown by certain of the evidence received upon the trial in the district court, also to have been indebted on his personal account, but to precisely whom and in what amounts, separate or aggregate, may not be determined advisedly. Here, it is recalled that so far as the public records before the court disclose, his ownership of any share of, or interest in, the land terminated with his joinder in the deed of the land to Carra A. Raulie on August 21, 1957, supra, and was not thereafter reacquired.
 
 
 175
 William W. Raulie, upon the Record, held the legal title in fee simple to the land from October 11, 1961 to May 10, 1962, supra, thus for one day less than seven months, inclusive of the entire winter season. The brevity of that tenure and its seasonal setting, therefore, probably combined to intercept the realization of results from any agricultural utilization of the land during that interval.
 
 
 176
 Evidence before the trial court tends to show that within that period of his ownership of the title to the land, and to some extent shortly before its inception, William W. Raulie, with the cooperation of Carra A. Raulie and Ray Raulie, made efforts to obtain a loan upon the land in the way of refinancing the indebtedness against it. Such indebtedness included the following encumbrances of record:
 
 
 177
 (1) A mortgage to John Hancock Mutual Life Insurance Company, originally for the principal sum of $20,000.00, on which, as the evidence indicates there was unpaid $18,000.00, plus interest;
 
 
 178
 (2) A mortgage to Gifford Hill Western, Inc., though with a questionable description of the land, for the principal sum of $1,358.00, for the foreclosure whereof an action had been instituted;
 
 
 179
 (3) A mortgage for the principal sum of $8,000.00 to one J. J. Steele;
 
 
 180
 (4) A mortgage for the principal sum of $2,000.00 to one J. J. Steele;
 
 
 181
 (5) A transcript of judgment in favor of Roberts Funeral Home, Inc., the judgment being for.$262.08;
 
 
 182
 (6) A transcript of judgment in favor of E.N.M.R. Telephone Company in the amount of $392.39;
 
 
 183
 (7) A transcript of judgment in favor of George L. Bradburn, dba Credit Adjustment Service, in the amount of $1,950.72;
 
 
 184
 (8) Taxes for the year, 1961, in the estimated amount of $156.02.
 
 
 185
 The foregoing items of indebtedness, all apparently involving liens, some in judgment, are revealed in an attorney's opinion upon title to the land, based upon an abstract of title, and addressed on May 10, 1962 to John Foster Clingingsmith. It does not disclose the extent to which interest and costs had accumulated on those items, or any of them.
 
 
 186
 Among the efforts made by and in behalf of William W. Raulie to refinance the land, approach was made to John Foster Clingingsmith. At least, in part, such approach was initiated by Carra A. Raulie. There is in evidence a letter bearing date March 19, 1962 from John Foster Clingingsmith to Carra A. Raulie, in which the writer says: 'I will be happy to work with you and your farm deal if you want to use me as a loan factor especially so to keep you from losing it.' That language expressly premises any cooperation by its writer upon the condition that he operate as a 'loan factor.' It is no commitment to his personal making of a loan; for a loan factor is one who functions as an 'agent' in the procurement of a loan. There was also before the trial court oral testimony to the effect that upon being approached by Carra A. Raulie, (Ray Raulie also being present) upon the project of making a loan upon the farm to William W. Raulie, 'Mr. Clingingsmith told him that he would not make any loan on the farm; and C.A. said that he wanted to get a loan, and that he didn't know where to go, that he had tried several sources, and Mr. Clingingsmith said that he had already told him that he would not make a loan, but that he would purchase the farm.' There is also testimony to the effect that William W. Raulie agreed that he would sell the land to John Foster Clingingsmith, and enter into a lease with an option to purchase agreement, and that it was upon that understanding that the Warranty Deed of May 10, 1962 was prepared and executed.
 
 
 187
 The several leases, and sharecrop, and related agreements followed the execution of that deed, supra.
 
 
 188
 To enable him to make, or to facilitate his making of, the disbursements required by his purchase of the land, John Foster Clingingsmith obtained from John Hancock Mutual Life Insurance Company a loan upon the security of a mortgage on the land for the principal sum of $30,000.00, and together with his wife, Kathryn Evelyn Clingingsmith, executed their promissory note evidencing, and their real estate first mortgage on the land, securing the indebtedness thus arising. Out of that loan, deduction was made $18,990.00 for the unpaid principal of, and the unpaid interest computed to July 1, 1962 upon, the former mortgage lien on the land, supra, and for $170.00 for attorney's fees and loan expense, and the residue was by John Hancock Mutual Life Insurance Company disbursed on the authorization of John Foster Clingingsmith, in the form of a check for $10,840.00 payable to J. J. Steele on account of the subordinate mortgage lien or liens by him held of record upon the land. The total amount due on that indebtedness to J. J. Steele was $14,384.29, of which, after the payment of the foregoing amount of $10,840.00, there remained the sum of $3,544.29, of which payment was made by check, dated July 17, 1962, payable to J. J. Steele and Rowley, Davis, Hammond & Murphy, his attorneys, and drawn against a trust account by Esther L. Smith, attorney at law. There is evidence in the record that at the same time, and by some seven other checks similarly drawn by Esther L. Smith (except one drawn on the same account by one Fred C. Tharp, a professional associate of Esther L. Smith) in sundry sums aggregating $3,816.69, payment was made of several other items of indebtedness against William W. Raulie, or one or the other of his brothers, all with the approval of William W. Raulie; and that the funds out of which such checks so drawn by Esther L. Smith and Fred C. Tharp were paid were furnished and provided by John Foster Clingingsmith; that the total amount of those checks was $7,360.98, and that John Foster Clingingsmith also made sundry other payments for items of indebtedness owed by, or in behalf of, one or the other of his brothers, assumed by John Foster Clingingsmith, with the consequence that the sum of his advancements beyond the proceeds of the $30,000.00 loan from John Hancock Mutual Life Insurance Company amounted at least to $8,000.00. And, of course, in the final analysis, he held the title to the land here involved, subject to the lien of the mortgage last above mentioned for $30,000.00.
 
 
 189
 An item of evidence in the case is a receipt in writing of William W. Raulie, Irene F. Raulie and Carra A. Raulie under date of July 26, 1962, in this language:
 
 
 190
 'The undersigned hereby acknowledge receipt of payment in full, from John Foster Clingingsmith of all sums due under the terms of that certain contract of purchase whereby W. W. Raulie et ux sold and conveyed and John Foster Clingingsmith purchased the following described premises in Curry County, New Mexico, to-wit: Lots five and six and the Southwest quarter of section three and the East half of the Southeast quarter of section four, Township two north, Range thirty-seven, East, N.M.P.M.
 
 
 191
 such sums including the principal balance due John Hancock Mutual Life Insurance Company secured by first mortgage on the above described premises, and the following payments in behalf of the undersigned:
 
 
 192
 J. J. Steele and Rowley, Davis, Hammond & Murphy $14,384.29
Gifford Hill Western & Wesley Quinn 673.91
Credit Adjustment Service 1,950.72
Homer Litchfield, County Treasurer 164.60
Roberts Funeral Home & Morris Stagner 262.08
Eastern New Mexico Rural Telephone Assn. 392.39
Hunker Abstract Company 57.00
 
 
 193
 Dated at Clovis, New Mexico, this 26th day of July, A.D. 1962.' That identification of the Steele payment is in respect of Steele's second and third mortgages before the conveyance to John Foster Clingingsmith. Each other payment relates to a tax item or an expense of the transfer of title, or an item of claim or indebtedness as against one or more of the Raulie Brothers.
 
 
 194
 Without repetition, it is now observed that the many and varied contractual instruments hereinbefore mentioned, and probably too extensively summarized or copied, came into being in relation to the land here involved, and incident to its ownership, after the deed of May 10, 1962, by John Foster Clingingsmith in community with his wife, Kathryn Evelyn Clingingsmith. Again, without repetition, it is recalled that each such instrument declares or is bottomed on, and either expressly or by necessary implication, admits, the ownership of the land in suit by John Foster Clingingsmith, and is premised upon such ownership.
 
 
 195
 As their prime appellate point, the defendants-appellants in their brief assert and argue that 'the deed dated May 10, 1962 from Appellants W. W. Raulie and wife Irene, to John Foster Clingingsmith, Appellee, was given as security for money to be loaned and the performance of a condition (i.e. refinancing of the John Hancock loan) and was, therefore, a mortgage.'
 
 
 196
 This court readily recognizes that an instrument in the form of a warranty deed may, by competent evidence, be shown in substance to be a mortgage, and, for the purposes of litigation, be so regarded. The litigants in this case so agree. And touching the basic possibility of such a judicial course authorities need not be assembled. Yet, the equitable indulgence thus accepted as allowable is not bestowed loosely.
 
 
 197
 It is said in 59 C.J.S. Mortgages p. 72, section 36, that:
 
 
 198
 'At common law, and under some statutes, the question whether a deed absolute in form is to be taken as a mortgage depends on the intention of the parties with respect to it at the time of its execution. In order to convert a deed absolute in its terms into a mortgage it is necessary that the understanding and intention of both parties, grantee as well as grantor, to that effect be concurrent and the same. A mere secret intention on the part of one of the parties, not disclosed or communicated to the other, will not have the effect of changing the character of the transaction. Still less will this result where the parties have directly contradictory intentions. It has been held that the intention of the parties, in order to change the character of the instrument appearing on its face, must be clearly established, and that when it is doubtful whether the deed was intended as a mortgage the intention of the parties as expressed in the contract should have some weight; but it has also been held that in case of doubt as to the intention of the parties the court will lean toward construing the instrument as a mortgage.'
 
 
 199
 A deed of conveyance is recognized as a contract. Upon the broad subject of statutory construction, it is said in 17A C.J.S. Contracts pp. 1138, 1139, section 568, that:
 
 
 200
 'Unless a contrary intention appears in the instrument, the words used are presumed to have been used in their ordinary or customary meaning, deliberately and with intention. The law does not assume that the language of the contract was carelessly chosen; but it must be presumed that the parties meant something by the words used, that they intended to achieve something definite and concrete in the contract, and that they intended the consequences of its performance. * * * Where words having a definite legal meaning are knowingly used in a contract, the parties thereto will be presumed to have intended such words to have their proper legal meaning and effect, in the absence of any contrary intention appearing in the instrument. It is presumed that the one who draws up a contract intended to express clearly his intent therein, and that he used words favorable to his interest. Where a written contract purports on its face to be a complete expression of the whole agreement, it is presumed that the parties introduced into it every material item and term; and the burden of showing that a contract means other than it says must be met by the litigant making the assertion. Parties have the burden of establishing the construction which they seek to place on words used in a contract as the only construction which could be fairly put thereon; and if an agreement is capable of several meanings, the onus is on the party seeking to show that his interpretation is the correct one to establish it with reasonable clearness.'
 
 
 201
 It need hardly be observed-- much less argued-- that, in the instant litigation the applicability of the foregoing admonitions touching contractual construction extends not only to the Warranty Deed of May 10, 1962, but, as well, to all and each of the several instruments in writing received in evidence during the trial, and especially, to the numerous contracts between the parties litigant, or any of them, whose execution occurred after May 10, 1962.
 
 
 202
 Entitled to persuasive consideration here is the position in relation to the subject just mentioned of the Supreme Court of New Mexico. Within that state the land is located, the Raulie brothers and Irene F. Raulie reside, many, though not all, of the conversations occurred which are reflected in the evidence, the deed of May 10, 1962 was executed, and the relations between the parties litigant are to be administered. That court, late in 1961, ruled upon an appeal from a judgment in an 'action to have two deeds declared an equitable mortgage, to require reconveyance of realty conveyed upon payment of claimed mortgage debt, and for an accounting of rents and profits.' The litigation was instituted by a mother against her grantee daughter and the latter's husband. Bell v. Ware, 69 N.M. 308, 366 P.2d 706, 707, 709. A judgment for the defendants theretofore entered by the trial court upon an instructed verdict was affirmed. In the course of its ruling, the Supreme Court of New Mexico said, inter alia:
 
 
 203
 '(1) This jurisdiction follows the great weight of authority that a deed, absolute in form, may be shown to have been intended as a mortgage and that this may be established by parol. King v. Warrington, 2 N.M. 318; Palmer v. The City of Albuquerque, 19 N.M. 285, 142 P. 929, L.R.A. 1915A, 1106; Sargent v. Hamblin, 57 N.M. 559, 260 P.2d 919; Boardman v. Kendrick, 59 N.M. 167, 280 P.2d 1053. See, also Trujillo v. Montano, 64 N.M. 259, 327 P.2d 326. (2) A deed, absolute in form, is presumed in law to be an absolute conveyance, and, in the absence of a showing of fraud, mistake, ignorance, or undue influence, the burden is on one seeking to establish it as a mortgage to overcome this presumption by clear, unequivocal, and convincing evidence. Sargent v. Hamblin, supra; 1 Glenn on Mortgages, 11 (1943); Osborne on Mortgages, 72, 74 and 76; Pomeroy's Equity Jurisprudence, Vol. 4, 1196. (5) Appellant testified that appellees told her, at the time of delivery of each of the deeds, that they would reconvey the property to her if she could find a buyer and repay them what they had paid or advanced to her. An agreement by a grantee to reconvey if grantor could find a buyer for the premises and repay the grantee is not sufficient to support a finding by the jury that the deeds were, in fact, intended as an equitable mortgage absent evidence of an enforceable indebtedness of the grantor to the grantee. (6) The decisive test is found in our decision in Sargent v. Hamblin, supra (57 N.M. 559, 260 P.2d 926), where it was said: 'One test which may be applied in determining the nature of the transaction is whether there exists mutuality and reciprocity of rights between the parties. In other words, it may be helpful to determine whether the grantee has the right to compel the grantor to pay the consideration named in the agreement for reconveyance. If he can compel such payment the transaction is generally regarded as a mortgage, while if he cannot compel such payment the transaction is generally regarded a conditional sale.' (7) See, also, the annotation at 155 A.L.R. 1104 and the cases cited. The great weight of authority supports the position that the existence of an indebtedness running from the grantor to the grantee is essential to a conclusion that a deed be construed as a mortgage. Not only must there be the indebtedness, but the rights and remedies of the parties must be mutual, that is, there must be the right of the grantee to demand and enforce his debt and the obligation of the grantor to pay. Wade v. McGinnis, 247 Ky. 261, 56 S.W.2d 1000; Hobbs v. Houston, 195 Ga. 571, 24 S.E.2d 884. If the grantee has no right to compel payment the transaction is a conditional sale. J. W. Pierson Co. v. Freeman, 113 N.J.Eq. 268, 166 A. 121. There is no assertion that the deeds were induced by fraud or by any overreaching on the part of appellees. (8) A careful examination of the record discloses that there is a complete absence of any proof of indebtedness from appellant to appellees which could be enforced by appellees. Applying the applicable rules, appellant has fallen short of establishing, by any substantial evidence, an intention to create an equitable mortgage.'
 
 
 204
 And that Supreme Court, in its reasoning, also recognized the appropriate reservation already discussed herein upon the scope of a ruling by an appellate court in review of the judgment of a trial court.
 
 
 205
 Earlier, and in 1953, the same Supreme Court had decided Sargent v. Hamblin, 57 N.M. 559, 260 P.2d 919, which it cited in Bell v. Ware, supra. Sargent v. Hamblin, supra, involved a controversy of long duration whether an instrument made in circumstances referred to in the quotation from the opinion, infra, was, in ultimate consequence, a mortgage or an absolute sale and conveyance. The issue, the ruling and the Supreme Court's reasoning are disclosed in the following quotation from the opinion:
 
 
 206
 'While there are many assignments of error, we believe there is but one question for determination by this court, and that is whether the agreement of sale together with the warranty deed, constitute a mortgage or an absolute sale with an option of repurchase. (1) One test which may be applied in determining the nature of the transaction is whether there exists mutuality and reciprocity of rights between the parties. In other words, it may be helpful to determine whether the grantee has the right to compel the grantor to pay the consideration named in the agreement for reconveyance. If he can compel such payment the transaction is generally regarded as a mortgage, while if he cannot compel such payment the transaction is generally regarded a conditional sale. 36 Am.Jur., Mortgages, 167, page 773; 37 Am.Jur., 1182, page 426; 41 C.J. Mortgages, 87, page 325; 59 C.J.S. Mortgages 27. The testimony given by plaintiff indicates that he never made a loan and never intended the transaction to be a loan. The purchase price was paid for the lands and the defendants under the agreement had an option to repurchase same within a definite time, which option they did not exercise. There was no debt remaining which could have been enforced by plaintiffs nor was the obligation on the part of the defendants, insofar as repurchase is concerned, one which could have been enforced by the plaintiffs. The obligation under the option was unilateral enforceable only by defendants. (2, 3) The intention of the parties at the time an agreement is consummated to execute a deed determines, whether title to the property is to be irrevocably transferred or the conveyance, though absolute in form, is to be merely as security for the payment of a debt or the performance of an obligation. In order for the defendant to have a deed, which is an absolute conveyance, as shown upon its face, declared a mortgage, it is incumbent upon such defendant to prove by clear and convincing evidence that the instrument was simply security and not an absolute deed. Parks v. Mulledy, 49 Idaho 546, 290 P. 205, 79 A.L.R. (934,) 937 and annotation therein; Harmon v. Grants Pass Banking & Trust Co., 60 Or. 69, 118 P. 188; 41 C.J. 96, page 331, 59 C.J.S. Mortgages 36. The undisputed evidence shows the execution and delivery, by defendants, of an absolute warranty deed, in the usual form, to plaintiffs, dated February 9, 1926, and a written agreement of sale dated February 6, 1926, executed by the plaintiff Edward Sargent, and defendant Ursula Looney Hamblin, whereby the defendant agrees to sell and convey to plaintiffs the premises described in said deed, upon the payment of $30,805.50, but, in case defendants exercise their option to repurchase, said property shall be deeded back to them. That the purchase price was fully paid by the plaintiffs as per agreement. (4, 5) The deed being absolute in form, the burden was upon defendants to show that it was a mortgage, the law presuming that an instrument is what it appears on its face to be, an absolute conveyance, and, in the absence of fraud or imposition, the proof to overcome this presumption and establish its character as a mortgage must be clear, unequivocal and convincing. Pomeroy's Jurisprudence, Vol. 4, 1196, page 586; 59 C.J.S. Mortgages 48(a-b) pp. 82, 83; Brandt v. Manson, Mo.App., 207 S.W.2d846; Parks v. Mulledy, supra; Gish v. Terrell, 266 Ky. 424, 427, 99 S.W.2d 168. There is no contention in the record that the plaintiffs perpetrated a fraud upon the defendants by which they were induced to execute to them the deed in question. After a very careful reading of the testimony and an examination of the exhibits, we conclude that the defendants have not shown by clear, unequivocal and convincing evidence that the deed was intended to be or is, a mortgage.'
 
 
 207
 The trial court in the present litigation was aware of the legal authority thus reflected, and of its responsible task in the determination without a jury of the issues, factual and legal, in the case. It had access to the voluminous court file of pleadings and the like, to all of the documentary evidence, and to the unimpaired recollection of the oral testimony, so recently received during the trial, as well as of the trial memoranda and oral arguments of counsel, and their respective and instructive requests for findings of fact and conclusions of law.
 
 
 208
 This court assumes-- more than that, the trial transcript convincingly discloses-- that the trial judge had alertly participated in the actual trial, and observed its explicit evidence and its implications. Beyond reasonable question, the trial court was aware of, and appropriately considered, the manifestly unusual institution of, and sequence of pleading in, the suit; the history of the acquisition in private ownership of the land now in litigation; its inheritance by the children and heirs at law of the patentee, their retention of it as tenants in common through several years; their eventual conveyance of it to Carra A. Raulie, inclusive all the while, of the general course, through those years of its operation. Inevitably considered also were the financial involvement of Carra A. Raulie, including his imposition on the land of the mortgage, originally for $20,000.00 to John Hancock Mutual Life Insurance Company, on the principal sum of which $18,000.00 remained unpaid at the termination of his tenure; his incurring of other items of indebtedness of which some became the subject of litigation; and his eventual conveyance of the property to William W. Raulie, probably in the hope that the latter, as a married man and a farmer, might be able to refinance, and effectively to operate, the farm.
 
 
 209
 Considered also by the trial court was the evidence concerning the persistingly accumulating indebtedness of the Raulie Brothers, even after the transfer, first to Carra A. Raulie, and later to William W. Raulie, of the land, inclusive of obligations of Carra A. Raulie and Ray Raulie, concerning which William W. Raulie assumed some interest, and, it would appear, in a practical way, some activity, if not economic responsibility, and the initiation of his efforts to procure more credit, in which he received the cooperation of Ray Raulie and Carra A. Raulie, especially the latter.
 
 
 210
 Evidence of the physical state of the land was before the court, including the installation, at an imprecisely defined date substantially prior to the conveyance to William W. Raulie, and probably in relation to the $20,000.00 loan above mentioned, of a single irrigation well and of substantial distribution piping, factors expensive, but contributory to the land's productive, and probably market, value, and much more recently of another irrigation well and of distribution piping.
 
 
 211
 The trial court inevitably considered also the evidence concerning the negotiations leading up to the execution of the conveyance of May 10, 1962, written to the limited extent that they were so conducted, and otherwise oral, including the negotiatory conferences, in the course of which there is testimony to the effect that John Foster Clingingsmith expressly refused to loan money to William W. Raulie, but said that he would be willing to buy the land; the manner in which the transaction was eventually effected, that is by the instrument of May 10, 1962, in language a warranty deed of conveyance in absolute title; the execution, shortly thereafter, and on June 27, 1962, of the initial lease, with option to purchase, supra, and the oral testimony that the granting of a lease and option of that nature, although not necessarily in terms identical with those in the June 27, 1962 contract, had been generally agreed to in the discussions leading to the conveyance of May 10, 1962, which the factual findings of the trial court appear to accept.
 
 
 212
 Also considered inevitably, were the several successive later contracts already identified and in their respective terms partly explained herein, in the verbiage of all of which, and in like manner as in the lease and option bearing date June 27, 1962, John Foster Clingingsmith was and is identified as the 'lessor,' therefore, the owner, and William W. Raulie as the 'lessee,' or the 'sharecropper,' as the instruments described him.
 
 
 213
 There is inescapable evidence that from and after the execution and delivery to him of the instrument of May 10, 1962, John Foster Clingingsmith exercised a control and dominion over the land consistent alone with his assertion and possession of its absolute ownership. He attended to the payment of taxes, enlarged by new and additional construction its irrigational well and distribution capacity, and especially involved himself in the problem of bringing the land under practical and productive operation. In that task the evidence, inclusive of the necessary implications of the succession of leases and operating contracts already identified herein, may well be considered to point to the practical impossibility of achieving efficient and economically viable operation of the land by, or under the personal control, of William W. Raulie. The teaching of those leases and contracts must inevitably have led to the execution and operation of the contract of October 31, 1964 whereunder Charlie Flynn became, and William W. Raulie ceased to be, the 'lessee' of the property. For there is evidence in the record that, theretofore, and during the period of at least one earlier operating agreement, Mr. Clingingsmith had procured and paid for the execution by specially employed help of work that naturally devolves, and by the agreement was imposed, upon an operating tenant.
 
 
 214
 It has already been mentioned that in arriving at its findings, conclusions and judgment, the trial court necessarily evaluated the credibility and probative significance of the testimony that was received upon the trial. In that not invariably easy ministry, the trial judge had the familiar advantage of listening personally to the testimony while he observed the witnesses, in the course and manner of its presentation. That opportunity is a factor which has contributed to the bestowal of a well recognized significance upon the determination respecting the evidence at which the trial judge ultimately arrives. He reckons too upon the background of each witness, and especially upon the interest of such witness in the controversy and in the result of the trial.
 
 
 215
 The trial judge may rationally evaluate the bearing upon a position ultimately taken in litigation by a party to a suit, of an inconsistent, or even diametrically opposite position by him theretofore assumed with respect to a material factual issue. Changes in such positions have a comparability to disparities, like in principle, between the oral trial testimony of a witness and antecedent inconsistent statements made by him. Thus, while an amended pleading by a litigant in which he assumes a position in respect of a matter of objective fact at direct variance with an original pleading earlier filed by him in an action, is effective to supersede the original pleading in respect of the making up of issues, the earlier pleading may, nevertheless, in the trial upon the facts, be exposed as evidence of the declaration by the pleader, at an earlier date, of the factual reality. And this is notably true when, in consequence of the intrusion into the case of a new or intervening contention, perhaps by a third party, it comes about that the pleader's interest will be served the better by his abandonment of his originally taken factual stance. With the support of cited authorities, Judge Swan (Judge Manton and District Judge Campbell concurring), in Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, 2 Cir., 32 F.2d 195, 198, said:
 
 
 216
 'Error is now assigned to the receipt in evidence of the original complaint, which was offered by the defendant both as evidence of agency and as a formal ratification of the contract.' (The trial had occurred before a jury.) 'One ground of objection to its admission was lack of proof of authority of the Railway's attorney to bind his client by the averments of the pleading. Such an objection is clearly not sustainable. A pleading prepared by an attorney is an admission by one presumed to speak for his principal. * * * 'A further objection was based upon the fact that the complaint had been superseded by an amended pleading. This objection is likewise unavailing. When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extrajudicial admission made by a party or his agent.'
 
 
 217
 See also Great American Indemnity Company v. Rose, 5 Cir., 242 F.2d 269; Giannone v. United States Steel Company, 3 Cir., 238 F.2d 544; Tiana Corporation v. Hartley, D.C.N.Y., 99 F.Supp. 670; Smiths America Corporation v. Bendix Aviation Corporation, D.C.N.Y., 140 F.Supp. 46; and Douds v. Seafarers' International Union, D.C.N.Y., 148 F.Supp. 953.
 
 
 218
 Without attributing controlling significance to this circumstance, this court has observed in its study of the present case that it does not involve any issue of alleged fraud on the part of John Foster Clingingsmith in the transaction wherein the land in question was conveyed to him. The defendants-appellants do not, by any pleadings, accuse him of fraud or coercion. Nor would the evidence support any such accusation if it had been made. At most the evidence may be regarded as indicative of a measure of firmness, perhaps even of aggressiveness, on the part of Mr. Clingingsmith in the exaction of rental provisions and devices protective of the 'lessor' or 'landlord' in one or more, or even all, of the leases, sharecrop contracts, and operating agreements which ensued after the conveyance to him of the land. But the trial court may well have regarded that posture on his part, if and so far as it existed, as naturally and circumstantially suggested, even in the inception of his ownership, and somewhat more persuasively supported by his experience with the actual operation of the land through the successive leases and other similar contracts. Besides, a lessor's foresight and firmness are, themselves, neither uncommon nor the badge of fraud, or even of coercion. There is no evidence either of fraud or of coercion on Clingingsmith's part. Nor is the absence of such evidence surprising in the light of the want of an issue inviting it.
 
 
 219
 Briefly adverting to the suggestion in behalf of the defendants-appellants touching the subject of the overall amount of rentals paid to and received by John Foster Clingingsmith after his acquisition of the land, this court is satisfied that the trial judge was aware of, and to the extent that he properly might, considered, such evidence upon that subject as was before him. But unless and until it be determined that the deed of the land to John Foster Clingingsmith was, in legal consequence a mortgage, the defendants-appellants must recognize that those rentals were and are the property of the owner and lessor of the land.
 
 
 220
 Evidence was produced upon the trial touching the fair market value of the land as of the date of its conveyance to John Foster Clingingsmith. As frequently occurs in that area of litigation, the testimony upon the question of fair market value disclosed a substantial variety in the estimates of such value. But it is clear that witnesses presented in behalf of the defendants-appellants, although differing somewhat among themselves, advanced the opinion that the land had a fair market value substantially exceeding the sum of all of the items properly allocable to the cost of the land to John Foster Clingingsmith. That testimony, although in the nature of opinions was properly received, for evidence of a disparity between the fair market value of, and the the price actually paid for, land, with due allowance to the proportionate extent of such disparity, may be considered in a case of this character. But such disparity alone, especially if it be not shocking-- and, in the instant context, it is not-- is not conclusive in favor of one who attacks the status of a deed as a sale. It is, indeed, to be considered along with all of the other relevant evidence in the case, and from such consideration the trier or triers of the facts must determine the issue whether the transaction was a sale or a conveyance in the nature of a mortgage. Beyond doubt, that consideration was bestowed upon the entire pertinent evidence in this case, inclusive both of the opinions just referred to, and of the history of the land in its management and operation, and the economic results theretofore ensuing from such management and operation, and all other factors reflected in the evidence which, with reasonable certainty, contributed to the price that might logically have been expected from a negotiated sale of the land. And this court does not consider that the trial court was mistaken in the conclusion at which it arrived out of that consideration.
 
 
 221
 The case on appeal having been maturely considered, this court is convinced that in his conduct of the trial in the District Court, Judge Bratton presided with manifest impartiality, understanding, circumspection, and courtesy; that, after the orderly submission of the issues, he arrived at a timely decision upon them, and declared his findings of fact and conclusions of law with complete clarity, and announced and directed the entry of the court's judgment clearly conforming to such findings of fact and conclusions of law. Of that judgment, and the findings of fact and conclusions of law, whereon it rests, this court considers that, together, they reflect an unquestionably permissible judicial degermination of this case, and effect an entirely correct result. If follows that the judgment of the trial court must be, and it is, therefore, affirmed.
 
 
 222
 Judgment of affirmance accordingly.
 
 
 
 *
 Sitting by designation from the Eighth Circuit
 
 
 [1]
 See also Glens Falls Insurance Company v. Newton Lumber and Manufacturing Company (10 Cir.), 388 F.2d 66, 70, 71
 
 
 [2]
 There is evidence that this sum was paid by Flynn to Mr. Clingingsmith on November 13, 1964